**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ESTATE OF ANDY LOPEZ, by and
through successors in interest,
Rodrigo Lopez and Sujay Cruz;
RODRIGO LOPEZ; SUJAY CRUZ,
          *Plaintiffs-Appellees*,

          v.

ERICK GELHAUS; COUNTY OF
SONOMA,
          *Defendants-Appellants*.

No. 16-15175

D.C. No.
4:13-cv-05124-
PJH


OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief District Judge, Presiding

Argued and Submitted May 10, 2017
Pasadena, California

Filed September 22, 2017

Before:  J. CLIFFORD WALLACE, RICHARD R.
CLIFTON, and MILAN D. SMITH, JR., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Wallace

**SUMMARY**[*]

**Civil Rights**

The panel affirmed the district court's order denying defendants' motion for summary judgment on the defense of qualified immunity in an action brought pursuant to 42 U.S.C. § 1983 alleging that Sonoma County Sheriff's Deputy Erik Gelhaus deployed excessive force when he fatally shot thirteen-year-old Andy Lopez.

Gelhaus shot Andy after witnessing Andy walking down the street with an object that looked like an AK-47 rifle. Andy did not comply with Gelhaus's directive to "drop the gun." The object turned out to be a plastic gun designed to replicate an AK-47, with the bright orange tip removed.

The panel held that viewing the facts in the light most favorable to plaintiffs, as the panel was required to do at this stage of the proceedings, Gelhaus deployed deadly force while Andy was standing on the sidewalk holding a gun that was pointed down at the ground. Gelhaus also shot Andy without having warned Andy that such force would be used, and without observing any aggressive behavior. Pursuant to *Graham v. Connor*, 490 U.S. 386 (1989), a reasonable jury could find that Gelhaus's use of deadly force was not objectively reasonable.

The panel further held that taking the facts as it was required to do on interlocutory appeal, Andy did not pose an immediate threat to law enforcement officials and therefore

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the law was clearly established at the time of the shooting that Gelhaus's conduct was unconstitutional. The panel held that ultimately, Gelhaus's entitlement to qualified immunity depended on disputed facts that needed to be resolved by a jury, and the panel therefore remanded the case for trial.

Dissenting, Judge Wallace stated that at the time of the shooting, legal precedent did not clearly establish that the use of deadly force under the circumstances was objectively unreasonable.

**COUNSEL**

Noah G. Blechman (argued) and James V. Fitzgerald III, McNamara Ney Beatty Slattery Borges & Ambacher LLP, Walnut Creek, California; Jesse F. Ruiz, Robinson & Wood Inc., San Jose, California; for Defendants-Appellants.

Gerald P. Peters (argued), Law Office of Gerald Philip Peters, Thousand Oaks, California, for Plaintiffs-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

Sonoma County and Sheriff's Deputy Erick Gelhaus appeal from an order denying their motion for summary judgment on the defense of qualified immunity in an action alleging that Gelhaus deployed excessive force when he fatally shot thirteen-year-old Andy Lopez in October 2013. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Jose Licea Drives by Andy Lopez Prior to the Shooting

On October 22, 2013, at approximately 3:15 p.m., Jose Licea, a civilian with no connection to any of the parties to this litigation, was driving northbound on Moorland Avenue in Santa Rosa, California. He noticed a person later identified as Andy Lopez[1] walking on the sidewalk a few hundred feet in front of him. Licea couldn't tell Andy's age, "but by the height, [Licea] was figuring it was a kid."[2]

When Licea got within approximately 150 feet of Andy, he saw that Andy was holding an object that looked like an

---

[1] We refer to the decedent, Andy Lopez, as "Andy" to be consistent with the district court's order. We refer to the plaintiffs-appellees—Andy's Estate and Andy's parents, Rodrigo Lopez and Sujay Cruz—collectively as "plaintiffs." We refer to the defendants-appellants, Erick Gelhaus and Sonoma County, collectively as "defendants" or, at times, simply as "Gelhaus."

[2] Another witness estimated that Andy was "11 or 12 years old," and described him as "the little guy," "no more than five feet."

AK-47. The gun was in Andy's left hand, the barrel was pointed at the ground, and Licea "could see it just swinging." Licea thought this was odd: "at that time in the afternoon, you know, someone walking around with an AK-47, to me, just – I couldn't see somebody doing that." Indeed, at "th[at] time of the day," he said, "someone is not going to be carrying a real rifle."

When Licea got within approximately fifty feet of Andy, he slowed down to look at the gun. When he saw it, he thought "it look[ed] fake." He suspected it was a BB gun because his mother-in-law had seen some children with them in the area several weeks earlier. Licea did not fear for his life or call the police; he continued on his way.

## B. Deputies Gelhaus and Schemmel See Andy

At the same time, Sonoma County Sheriff's Deputies Erick Gelhaus and Michael Schemmel were on routine patrol in a marked police car driving northbound on Moorland Avenue. Gelhaus was training Schemmel because Schemmel had just transferred to Sonoma from a nearby police department. Gelhaus was aware that they were patrolling a part of the county known for gang activity and violent crime. Still, he had not worked in the area in the last few years, it was the middle of the day, and there was no activity on the police radio.

With Schemmel at the wheel and Gelhaus in the passenger seat, the officers approached a stop sign at West Robles Drive. That is when Gelhaus noticed Andy walking in a direction away from the officers along the west sidewalk on Moorland Avenue. Andy was "[w]alking at a normal speed" and, according to Gelhaus, his motions did not appear aggressive. Andy was not "trying to get away from us," Gelhaus recounts, "he was just walking away from us."

Gelhaus could not determine Andy's age—Andy was about 100 feet away and was wearing a hooded sweatshirt. To Gelhaus, Andy nonetheless appeared to be "[s]omebody in their mid to late teens," and did not appear to be a gang member.

Gelhaus noticed Andy's gun, which he believed to be an AK-47. Gelhaus believed this in part because he had previously confiscated an AK-47 within one mile of Andy's location. That said, he had never seen a person walk down the street in broad daylight carrying an AK-47. Moreover, he had also confiscated what turned out to be toy guns on three prior occasions while on patrol. During the most recent of those occasions, Gelhaus responded to a call involving subjects with rifles in a park. He used his loudspeaker from a distance of 100 yards to direct the individuals to put down their guns. The suspects complied, and the incident was resolved without charges.

Gelhaus saw Andy holding the gun in his left hand, "by the pistol grip, down at his side," with the muzzle pointed towards the ground. Schemmel reported he saw Andy holding the gun in his right hand, and Schemmel's subsequent declaration does not specify in which hand the gun was held. As Andy was walking, "the weapon would swing somewhat," but Gelhaus could not see if Andy's finger was on the trigger. Once Gelhaus noticed Andy's gun, he quickly alerted Schemmel, then called in a "Code 20," which is used to request that all available units report immediately on an emergency basis.

## C.  The Incident

As Schemmel trained his attention on Andy, he drove past the stop sign and crossed the intersection with West Robles Drive. Simultaneously, he flipped on the emergency

lights and "chirped" the patrol car's siren. Schemmel believes he saw Andy "briefly glance backwards" over his right shoulder at this point. Gelhaus did not see Andy make any such turn, nor does he recall ever hearing the patrol car's "chirp."

Once Schemmel cleared the intersection, he veered into the southbound lane and stopped at a forty-five degree angle with the west sidewalk. As the car was slowing down, Gelhaus removed his seatbelt, drew his pistol, and opened the passenger side door. The deputies were parked approximately forty feet behind Andy at this point. Once stopped, Gelhaus situated himself at the V of his open door, and knelt on the ground.

Now outside, Gelhaus aimed his pistol at Andy and yelled loudly at least one time, "Drop the gun!" Andy had been walking this whole time, so he was about sixty-five feet from the officers when Gelhaus shouted. Andy did not drop the gun; he paused a few seconds and began to rotate his body clockwise. Gelhaus then "saw the gun come around" as Andy's torso turned. The parties dispute what happened next.

According to Gelhaus's declaration, "[w]ith the weapon still in [Andy's] left hand swinging around and toward [the officers], and with the barrel of the weapon coming up," Gelhaus fired eight shots in rapid succession, seven of which hit Andy. In his videotaped deposition, however, Gelhaus stated that Andy "didn't turn towards me when I shot him."[3] Gelhaus shot Andy in the chest, so Andy was facing the officers when Gelhaus opened fire. Gelhaus concedes that he does not know where Andy was pointing the rifle at the

---

[3] Later in the deposition, Gelhaus contradicted this statement.

time that he was shot.  Nor does Gelhaus know if Andy's gun was ever actually pointed at him.

At his deposition, Gelhaus was asked to reenact how Andy was holding the gun, "his turning motion," and "what you saw him do."  The video depicts the gun in Gelhaus's fully-extended arm and at his side as he turns, consistently pointed straight down towards the ground.[4]

The defendants' experts opined that it was "likely" that Andy "partially raised" the gun.  Plaintiffs' experts disagreed.  They created three-dimensional models of Andy's movements, and in each of the re-creations, Andy's gun barrel is pointed down at the ground throughout Andy's turn.  One expert further insisted that from the physical evidence alone "[i]t cannot be determined . . . if the [rifle] was held in the left or right hand . . . or if the [rifle] was elevated or pointed at the officers prior to the shooting."

Because Schemmel was the driver, he insists he was unable to get into position until Gelhaus had already stopped firing.  According to Schemmel's declaration, "[Andy] turned to his right with his whole body toward us, and as he did so, the gun was turning with him and it was raising and turning toward us."  Asked in his deposition, however, if

---

[4] The video is ambiguous regarding the extent to which Gelhaus was modeling Andy's total movements.  Gelhaus remarks: "I saw the gun come around, and I think with the torso with it. . . . It was this."  Then, a few moments later, he adds, "with the table blocking the path."  In the video, there appears to have been room to raise the gun, so it is not clear what path the table was blocking.  It could have been the turn of Andy's torso, the motion of the gun, or how Andy moved as he was shot or as he fell.  Notably, if the weapon rose in a manner that was objectively threatening, one would think that Gelhaus would be eager to demonstrate the upward motion.  Gelhaus's reenactment does not do so.

"[a]t any time before [he] heard gunshots, [he saw] [Andy's] *left* hand move," Schemmel responded, "I don't recall."

Andy collapsed after the shots and Deputies Gelhaus and Schemmel remained crouched behind their car doors. Once other deputies arrived, Gelhaus and two other officers approached Andy with their guns pulled. As he was standing over Andy, Gelhaus realized for the first time that the gun's coloring was different from that of a real AK-47. When he moved the weapon away, he also noticed that Andy's gun was much lighter. It turns out that Andy was holding a plastic gun designed to replicate an AK-47. The toy did not have an orange tip at the end of the barrel, and defendants' experts submit that it was not possible for Gelhaus to visually distinguish Andy's weapon from a real AK-47 at the distance involved in this case.

At the time of the shooting, Andy was standing next to an open field in a residential neighborhood. The site of the shooting is also close to three schools and the shooting occurred when school was out of session. There were no other people present at the shooting. There were a few individuals outside in the surrounding neighborhood. Andy had been walking in the general direction of several houses before Gelhaus shouted, and Gelhaus submits that he did not want to let Andy get near them.

Gelhaus stated that he was aware at the time of the shooting that rounds from an assault rifle can penetrate car doors. Thus, when Gelhaus fired, he did not believe that he had any cover or protection.

Finally, the total elapsed time from the "chirp" to the shots was approximately twenty seconds. Andy died on site from his wounds.

### D. Procedural History

Andy's estate brought suit on November 4, 2013, asserting, among other things, a claim against Gelhaus pursuant to 42 U.S.C. § 1983 for a Fourth Amendment violation. Gelhaus and Sonoma County filed a motion for summary judgment on the basis of qualified immunity. The district court denied the motion in relevant part on January 20, 2016. *See Estate of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154, 1158–65 (N.D. Cal. 2016).

At the first step of the qualified immunity analysis, the district court held that a jury could find that Gelhaus acted unreasonably when viewing the evidence in the light most favorable to Andy.[5]   *Id*. at 1162.   In particular, after reviewing the relevant evidence, the court held that it could "conclude only that the rifle barrel was beginning to rise; and given that it started in a position where it was pointed down at the ground, it could have been raised to a slightly-higher level without posing any threat to the officers." *Id*. In light of that finding, the record did not compel the conclusion that Gelhaus was threatened with imminent harm. The court distinguished Gelhaus's authority as involving suspects who either (1) physically assaulted an officer, (2) pointed a weapon at officers or others, (3) made a sudden movement towards what officers believed to be a weapon, or

---

[5] Specifically, the court incorporated its earlier analysis of the motion for summary judgment on the Fourth Amendment claim. There, it held that "there remains a triable issue of fact as to whether defendant Gelhaus' use of deadly force was reasonable." By sending it to the jury, the court necessarily held that, when viewing the evidence in the light most favorable to Andy, a reasonable jury could find that Gelhaus acted unreasonably.

(4) exhibited some other threatening, aggressive, or erratic behavior. *Id.*

Having concluded that the plaintiffs could show a constitutional deprivation, the court turned to step two. It asked "whether the law was clearly established such that an officer would know that the use of deadly force is unreasonable where the suspect appears to be carrying an AK-47," but where "officers have received no reports of the suspect using the weapon or expressing an intention to use the weapon," "the suspect does not point the weapon at the officers or otherwise threaten them with it," "the suspect does not 'come at' the officers or make any sudden movements towards the officers," and "there are no reports of erratic, aggressive, or threatening behavior." *Id.* at 1164. The court said that the law was clearly established that under those "specific circumstances," the use of deadly force was unreasonable. *Id.* at 1164–65. The court did not directly identify a precedent that put Gelhaus on notice that his conduct was unconstitutional.

Gelhaus filed a timely notice of appeal on February 4, 2016.

## STANDARD OF REVIEW

We review summary judgment determinations *de novo*. *Glenn v. Wash. Cty.*, 673 F.3d 864, 870 (9th Cir. 2011). We also review *de novo* a defendant officer's entitlement to qualified immunity. *Id.*

## ANALYSIS

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Gelhaus insists he is entitled to qualified immunity on plaintiffs' Fourth Amendment claim. "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct."**[6]** *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 232). Here, taking the facts as we must regard them on this interlocutory appeal, a reasonable jury could conclude that Gelhaus deployed excessive force in violation of the Fourth Amendment. Additionally, the alleged violation of Andy's Fourth Amendment right was clearly established at the time of Gelhaus's conduct.

## I. Step One—Whether a constitutional right was violated.

Plaintiffs assert that Gelhaus deployed excessive force in violation of the Fourth Amendment. This claim is governed by an "objective reasonableness standard," which requires a

---

**[6]** "[W]e have discretion to decide which prong to address first," and need not necessarily reach both. *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016).

"careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989) (internal quotation marks omitted). The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. We therefore judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The Supreme Court's decision in *Graham* identified several factors to consider when evaluating the strength of the government's interest in the force used: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). These factors are non-exhaustive. *Bryan*, 630 F.3d at 826. Courts still must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Id.* (internal quotation marks omitted). "Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed." *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016). "With respect to the possibility of less intrusive force, officers need not employ

the least intrusive means available[,] so long as they act within a range of reasonable conduct." *Id.*

We have held that "summary judgment should be granted sparingly in excessive force cases." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc). "This principle applies with particular force where," as here, "the only witness other than the officers was killed during the encounter." *Id.* "In such cases, we must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead— is unable to testify." *Id.* (internal quotation marks omitted). "Accordingly, we carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* (internal quotation marks omitted). "We must also examine circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.* (internal quotation marks omitted).

"Although we must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, we are also limited to considering what facts the officer could have known at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *White v. Pauly*, 137 S. Ct. 548, 550 (2017)). Ultimately, in this interlocutory appeal, we ask "whether the defendants would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *George*, 736 F.3d at 836 (internal quotation marks and alteration omitted).

*A.   To assess whether a reasonable jury could find a Fourth Amendment violation, we must first resolve several factual disputes.*

Applying *Graham*, Andy was not committing a serious crime or attempting to evade arrest by flight.  The first and third factors thus weigh clearly in Andy's favor.  We therefore are left with the "most important" factor—whether Andy posed an "immediate threat to the safety of the officers or others."  *George*, 736 F.3d at 838 (internal quotation marks omitted).  To make that determination, we must resolve a number of genuine factual disputes, considering the evidence in the light most favorable to the nonmoving party—here, the plaintiffs.

First, because Schemmel and Gelhaus disagree as to whether Andy "briefly glance[d] backwards" over his right shoulder after the patrol car's "chirp," we must assume that Andy did *not* briefly glance backwards and therefore was unaware that someone was behind him until Deputy Gelhaus shouted "drop the gun."  *See Saucier v. Katz*, 533 U.S. 194, 207 (2001) ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officer[] had when the conduct occurred."); *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005) (stating that courts may consider only the facts that were known to the defendant officer).  This disputed fact is significant because it sheds light on Andy's possible motivations in turning to face the officers.  In particular, Andy's subsequent turn appears less aggressive because he could have been attempting to see if he was the object of the call, or could have been turning out

of startled confusion given that he was carrying only a toy gun.**[7]**

Second, there is a factual dispute regarding the number of times that Gelhaus shouted. Gelhaus can state definitively that he yelled only once. If the case goes to trial, the jury may hear evidence of additional shouts, but for purposes of this interlocutory appeal, we must assume that there was only one. As before, the number of commands is relevant to our consideration of how a reasonable officer would view Andy's motivation in turning around. Assuming there was only one shout, Andy may have been wondering if it was directed at him, or he could have been processing Gelhaus's order in the three seconds before he was shot.

Third, there is a factual dispute regarding whether Andy held the gun in his right or left hand. Gelhaus says it was the left, but Schemmel says it was the right. We cannot resolve this, but the dispute is important. The "swinging around" of the gun would look vastly different if Andy turned clockwise with the weapon in his right hand, as opposed to his left. The dispute is also material to Deputy Gelhaus's account because he was looking over Andy's *right* shoulder from behind. Yet, Gelhaus's testimony is predicated on the gun coming

---

**[7]** Though Gelhaus does not recall hearing the patrol car's "chirp," the chirp is audible in the recording of the dispatch call. We therefore may account for the chirp in our analysis. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007). The chirp on the recording lasts for a fraction of a second. The tone ascends briefly and resembles the "blip" of an emergency vehicle. Drawing reasonable inferences in favor of the plaintiffs, the chirp did not put Andy on notice that anyone, much less a police officer, sought his attention. The chirp was emitted from a vehicle on the other side of an intersection more than a hundred feet behind Andy. Even if Andy somehow knew that the chirp was emitted from a police car, as opposed to some other kind of emergency vehicle, the car could have been attempting to make a U-turn or another maneuver.

into view as it swung around from the *left*. At minimum, we must be mindful that Schemmel's statement provides an important basis for a jury to question the credibility and accuracy of the officers' accounts. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("[I]n the deadly force context, we cannot simply accept what may be a self-serving account by the police officer." (internal quotation marks omitted)).

Fourth, and most importantly, there is a factual dispute regarding the movement of Andy's gun. As with all factual findings, we are bound by the district court's finding on this critical issue.

On an interlocutory appeal of a denial of qualified immunity, our review is limited to "purely legal issues." *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998). "[W]e must take, as given, the facts that the district court assumed when it denied summary judgment for a (purely legal) reason." *Id.* (internal quotation marks and alteration omitted). "[W]here the district court does not explicitly set out the facts that it relied upon, we undertake a review of the pretrial record only to the extent necessary to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id.* (internal quotation marks omitted).

Here, the district court made few explicit findings, but this issue was the exception. The court expressly found that it "can conclude only that the rifle barrel was beginning to rise; and given that it started in a position where it was pointed down at the ground, it could have been raised to a slightly-higher level without posing any threat to the officers." *Lopez*, 149 F. Supp. 3d at 1162. As a practical matter, this finding makes sense. Neither officer ever stated how much the barrel "began" to rise as Andy commenced

his turn, despite having the opportunity to do so.[8] Moreover, one would expect the barrel to rise an inch or so as the momentum of Andy's clockwise turn moved his left arm slightly away from his body. But that incidental movement alone would not compel a jury to conclude that Gelhaus faced imminent danger given the starting position of the gun. Furthermore, this interpretation is bolstered by Gelhaus's admission that the weapon would benignly "swing somewhat" with each step that Andy took.[9] Because we are obligated to view the evidence in the light most favorable to Andy, we must assume for purposes of this interlocutory appeal that, as the district court found, the barrel of the weapon could incidentally have risen, as part of the natural turning motion, only "to a slightly-higher level [that did not] pos[e] any threat to the officers." *Id.*; *see also id.* at 1158 ("[D]efendants have not established that Andy actually threatened the officers with the rifle that he was holding."); *id.* at 1164 (stating that Andy did not "point the weapon at the officers or otherwise threaten them with it").

Of course, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

---

[8] The district court stressed that the "defendants do not allege that Andy ever pointed the rifle at either officer or at anyone else." *Lopez*, 149 F. Supp. 3d at 1158. Instead, they "use carefully-phrased language to describe Andy's actions, saying only that Andy 'turned and *began to point* the AK-47 towards the deputies,' or that Andy was 'bringing the barrel of the AK-47 weapon *up and around in their direction*,' or that he was '*in the process* of pointing [it] at the deputies.'" *Id.* (emphasis in original).

[9] Gelhaus stated that none of Andy's motions as he walked—including the swinging of the gun—appeared aggressive. Licea also testified that he "could see [the gun] just swinging," but nonetheless never feared for his life during the interaction.

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Here, however, the district court's finding is amply supported by the record. Gelhaus himself reenacted how Andy was holding the gun, "his turning motion," and "what [Gelhaus] saw him do." The video depicts the gun in Gelhaus's fully-extended arm and at his side as he turns, consistently pointed straight down towards the ground. Gelhaus also concedes that he does not know where Andy was pointing the rifle at the time that he was shot. Nor does Gelhaus know if Andy's gun was ever actually pointed at him. Plaintiffs' experts examined all of the evidence in this case and created three-dimensional models of Andy's posture and positions. In each of the re-creations, Andy's gun barrel is pointed down at the ground throughout Andy's turn. Measured against this, the defendants' experts merely opined that it was "likely" that Andy "partially raised" the gun. And, because the expert reports contravene each other, defendants fundamentally rely on Gelhaus's self-serving declaration. But again, where there is no surviving witness, "we carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Gonzalez*, 747 F.3d at 795 (internal quotation marks omitted). Bearing that in mind, the present record furnishes abundant grounds for a jury to reasonably question Deputy Gelhaus's credibility and accuracy:

- Gelhaus's reenactment in the video contravenes his statement that he fired "with the barrel of the weapon coming up."

- Though Gelhaus submits that Andy had the gun in his *left* hand, Schemmel reports that Andy held the gun in his *right* hand. Asked in his deposition if "[a]t

any time before [he] heard gunshots, [he saw] [Andy's] *left* hand move," Schemmel responded, "I don't recall." The swinging of the gun would look vastly different if Andy turned clockwise with the gun in his right hand, as opposed to his left.

- Gelhaus's declaration states that Andy turned towards him, but in his videotaped deposition he stated: "[Andy] didn't turn towards me when I shot him."

- Gelhaus expressly concedes that he does not know where Andy was pointing the rifle at the time that he was shot. He also concedes that he does not know if Andy's gun was ever pointed at him.

- Gelhaus's declaration states that "[t]here were no unusual markings or colorings on the weapon which were visible to me which indicated that the weapon was anything other than an AK-47." Licea states, however, that when he got within approximately fifty feet of Andy—which is *further away* than Gelhaus stood when Gelhaus first confronted Andy—he thought the gun "look[ed] fake."[10]

---

[10] The dissent would erroneously discredit Licea's testimony because, in the dissent's view, it is based "largely" on "facts and circumstances unique to him." The dissent speculates that Gelhaus, unlike Licea, would not have shared the assumption that the AK-47 might be fake, even though Gelhaus had never seen a person walk down the street in broad daylight carrying an AK-47 and had confiscated a fake M-4 style assault rifle on a previous occasion. The dissent additionally faults Licea for not predicting and explicitly relying on the dissent's preferred facts, and ultimately attributes Licea's view that the gun looked fake to Licea's "own idiosyncratic understandings." The dissent's

- • When speaking to homicide investigators, Gelhaus originally described Andy as a "man." He later conceded that he thought Andy looked to be "[s]omebody in their mid to late teens."

In light of the plaintiffs' evidence, and the inconsistencies in Gelhaus's testimony, it is not the case that the district court's finding that Andy's gun posed no threat to the officers "is so utterly discredited by the record that no reasonable jury could [believe it]." *Scott*, 550 U.S. at 380. The record supports the district court's conclusion, and certainly would not compel a jury to conclude to the contrary. Thus, in this interlocutory appeal, we must accept the district court's factual finding that the position of Andy's gun barrel never posed any threat to Gelhaus or Schemmel as Andy turned. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) ("[W]e must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.").[11]

---

approach not only fails to "view the evidence in the light most favorable to the opposing party," but also oversteps its bounds. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam). At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[11] *George v. Morris*, 736 F.3d 829 (9th Cir. 2013), provides a useful illustration of these principles. In *George*, three sheriff's deputies responded to a domestic disturbance involving a firearm. *Id.* at 832.

### B. A reasonable jury could find a Fourth Amendment violation when viewing the facts in the light most favorable to plaintiffs.

Once again, our task at step one is to decide whether the facts that plaintiffs have shown make out a constitutional violation. *Pearson*, 555 U.S. at 232. Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could come to the following factual conclusions: (1) the officers came across Andy while on routine patrol, not in response to a crime or a report of someone acting erratically; (2) when Deputy Gelhaus saw Andy, he looked like a teenager, and not like a gang member; (3) Andy was walking

---

They found the husband standing on a second-floor balcony holding a gun in his left hand "with the barrel pointing down." *Id.* One deputy insisted that the husband raised and pointed the weapon in his direction, prompting the deputy to fire. *Id.* at 833 n.4. Like here, however, the record "called into question whether [the husband] ever manipulated the gun, or pointed it directly at [the] deputies." *Id.* at 833. Because there was no surviving witness, the district court "parsed the deputies' testimony for inconsistencies," as required by *Scott. Id.* at 835. It concluded that "a reasonable jury could disbelieve the officers' testimony," and that a jury could "rely on record evidence to conclude that [the husband] had not ignored commands to drop the gun, or taken other threatening measures such as pointing the weapon at [the] deputies." *Id.* (internal quotation marks omitted).

The deputies filed an interlocutory appeal of the district court's order. We acknowledged that when an individual points a gun in an officer's direction, "the Constitution undoubtedly entitles the officer to respond with deadly force." *Id.* at 838. We also acknowledged that "[i]f the person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* But, given the district court's analysis, we held that "[o]n this interlocutory appeal . . . we can neither credit the deputies' testimony that [the husband] turned and pointed his gun at them, nor assume that [the husband] took other actions that would have been objectively threatening." *Id.* We are similarly constrained here.

normally and his motions did not appear aggressive; (4) Andy was carrying a weapon that looked like an AK-47, but given Gelhaus's prior "weapon" confiscations, Gelhaus knew that there was some possibility that it was a toy gun; (5) Andy was holding the gun by the pistol grip, down at his side, with the muzzle pointed towards the ground; (6) Andy was carrying the weapon in broad daylight in a residential neighborhood at a time when children of his age reasonably could be expected to be playing; (7) after parking behind Andy, Gelhaus shouted "drop the gun" one time, and that shout was the first moment that Andy became aware that someone was behind him; (8) within seconds, Andy began to turn around naturally in a clockwise direction, still holding the gun; (9) Andy did not know until he turned that the person who shouted was a police officer, and Gelhaus was aware of that fact because he had not seen Andy look back prior to that time; (10) as Andy turned, the weapon turned with him; (11) the gun barrel might have raised slightly as Andy turned, but given that it started in a position where Andy's arm was fully extended and the gun was pointed straight down at the ground, the barrel never rose at any point to a position that posed any threat to either of the officers; (12) Gelhaus deployed deadly force without knowing if Andy's finger was on the trigger, without having identified himself as a police officer, and without ever having warned Andy that deadly force would be used; (13) Andy was shot while standing next to an open field with no other people around, (14) and Gelhaus knew it was possible to use less intrusive force given his prior experience at the park.

On these facts, a reasonable jury could conclude that Andy did not pose an "immediate threat to the safety of the officers or others," *George*, 736 F.3d at 838 (internal quotation marks omitted), and that Gelhaus's use of deadly force therefore was not objectively reasonable. In cases

involving comparable degrees of apparent danger, we have rejected summary judgment on Fourth Amendment claims. *See id.* (denying summary judgment where a suspect held a gun in his left hand with the barrel pointing down, and did not point the gun at the officers or engage in threatening behavior); *see also Hughes v. Kisela*, 841 F.3d 1081, 1085–87 (9th Cir. 2016) (rejecting summary judgment where a woman was shot as she approached another person while holding a knife down by her side, but where the woman with the knife did not make any aggressive or threatening actions and did not understand what was happening when the officers yelled for her to drop the knife); *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1233–34 (9th Cir. 2013) (reversing a district court's grant of summary judgment where a victim approached officers while armed with a knife, but where the suspect "was not charging them," "had not been ordered to stop," "was given no warning," and was not witnessed acting erratically with the weapon); *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 324–25 (9th Cir. 1991) (rejecting summary judgment where the suspect had a gun, but where the suspect was not pointing it at the officers, and was not directly facing the officer who opened fire).

Moreover, Gelhaus indisputably had time to issue a warning, but never notified Andy that he would be fired upon if he either turned or failed to drop the gun. *See Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) (holding that "warnings should be given, when feasible, if the use of force may result in serious injury"). Lastly, while it is true that "[i]f the person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat," a reasonable jury could find that Andy turned naturally and non-aggressively in light of the overall context. *See George*, 736 F.3d at 838; *see also infra* Part B.

Gelhaus counters that the district court misdiagnosed the immediacy of the threat given its acknowledgment that Andy's "rifle barrel was beginning to rise." But Gelhaus omits to mention the district court's finding that a jury nonetheless could conclude that the gun posed no threat to the officers and remained pointed at the ground throughout Andy's turn. In any event, the cases upon which Gelhaus relies to establish that his conduct was objectively reasonable involved threats to officers that were far more direct and immediate than that posed by Andy.

Gelhaus first cites *Cruz*. In that case a confidential informant told the police that Cruz "was a gang member who sold methamphetamine and carried a gun." 765 F.3d at 1077. Following the lead, police "determined that Cruz was a discharged parolee whose prior convictions included a felony involving a firearm." *Id.* Later, the informant told the police where Cruz was located "and that he was armed with a nine-millimeter." *Id.* at 1077–78. "The informant also reported that Cruz was carrying the gun in his waistband and had made it clear that 'he was not going back to prison.'" *Id.* at 1078. After police surrounded Cruz with their vehicles, he "attempted to escape, backing his SUV into one of the marked patrol cars in the process." *Id.* Once stopped, Cruz opened his door and the police "shouted at him to get on the ground as he was emerging from the vehicle." *Id.* According to the officers, Cruz "ignored their commands and instead reached for the waistband of his pants." *Id.* The officers opened fire, killing Cruz. *Id.*

We observed that "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *Id.* We nonetheless denied summary judgment on plaintiff's excessive force claim

because the only evidence of Cruz's threatening gesture was the officers' self-serving testimony, and because there was circumstantial evidence that could permit a reasonably jury to find "that the officers lied." *Id.* at 1080.

Here, Gelhaus submits that if reaching for a gun justifies deadly force, then Andy's turn while holding a gun justifies it, too. Andy's circumstances, however, were not nearly as threatening as those involving Cruz. What is more, Gelhaus overlooks that we *denied* summary judgment in *Cruz* because the only evidence of a harrowing gesture was the officers' self-serving testimony. *See id.* The same is true here—the evidence that the gun began to rise comes almost exclusively from Gelhaus and Schemmel. The jury might not believe their testimony given that Gelhaus does not know where Andy was pointing the rifle and does not know if the gun was ever actually pointed in his direction.

Next is *Mendez v. County of Los Angeles*, 815 F.3d 1178 (9th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1539 (2017). There, we sanctioned the use of deadly force where two officers barged into a shack and saw a man holding a gun. *Id.* at 1185. The deputies testified that the rifle was "pointed at them," and the district court found as a fact that the gun "was pointed at the deputies." *Id.* at 1185–86. Here, on the facts as we must regard them, a similar circumstance is not present.[12]

---

[12] As in *Mendez*, plaintiffs additionally contend that Gelhaus is liable pursuant to the "provocation doctrine" or basic notions of proximate cause. *See* 815 F.3d at 1193–95. However, the Supreme Court recently rejected the provocation rule. *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1543–44 (2017). Plaintiffs' proximate cause argument fails because there is no predicate Fourth Amendment violation. *See id.* at 1548–49.

In *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), police received reports of a man behaving erratically while carrying a three-foot Civil War-era cavalry saber around a residential neighborhood. *Id.* at 1112. After finding the man, officers ordered him to drop the sword and warned him by saying "We'll shoot," and the suspect consciously disobeyed the officers' orders. *Id.* at 1112–13. Then, after the suspect tried to enter a house, the officers opened fire, severely injuring the man. Here, there were no reports of erratic behavior, the officers never warned Andy that deadly force might be used, Andy never tried to enter a house, and we cannot presume that Andy consciously disobeyed an officer's order.

Lastly, in *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), officers were informed that a man appeared to have a gun under his sweater. *Id.* at 128. After approaching the suspect, the officers ordered him to raise his hands and get on his knees. *Id.* The suspect raised his hands, but then lowered them suddenly "without explanation to the officers, in an attempt to reach into his back left pocket to turn off his Walkman radio." *Id.* Perceiving a threat, one of the officers opened fire. *Id.*

The Fourth Circuit held that the officer was entitled to qualified immunity because he "had sound reason to believe that Anderson was armed," and therefore "acted reasonably by firing on Anderson as a protective measure before directly observing a deadly weapon." *Id.* at 131. Here, unlike in *Anderson*, we cannot presume that Andy consciously disobeyed an officer's order. Moreover, in contrast to the Fourth Circuit, we have held that mere possession of a weapon is insufficient to justify the use of deadly force. *See Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). It is also worth noting that a reasonable jury

could conclude that, in contrast to Anderson's sudden hand movement, Andy's simple act of turning was not a harrowing gesture in light of the overall context.[13]  *See infra* Part B.

In sum, viewing the facts in the light most favorable to plaintiffs, as we must at this stage of the proceedings, Gelhaus deployed deadly force while Andy was standing on the sidewalk holding a gun that was pointed down at the ground.  Gelhaus also shot Andy without having warned Andy that such force would be used, and without observing any aggressive behavior.  Pursuant to *Graham*, a reasonable jury could find that Gelhaus's use of deadly force was not objectively reasonable.  Plaintiffs therefore can demonstrate a constitutional violation assuming, again as we must at this stage of the proceedings, that factual disputes are resolved and reasonable inferences are drawn in plaintiffs' favor.[14]

---

[13] Gelhaus presses a number of other easily distinguishable precedents in addition to those already discussed.  *See Lal v. California*, 746 F.3d 1112, 1114 (9th Cir. 2014) (after high speed chase, suspect advanced at officers with football sized rock over his head and was shot after being warned); *Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (suspect attacked officer and turned officer's gun against him), *abrogated in part*, *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Reynolds v. Cty. of San Diego*, 84 F.3d 1162, 1165 (9th Cir. 1996) (suspect made sudden, upward swing at officer with a knife); *Scott v. Heinrich*, 39 F.3d 912, 914 (9th Cir. 1994) (suspect "acting crazy" pointed gun directly at officers); *Garcia v. United States*, 826 F.2d 806, 808 (9th Cir. 1987) (suspect violently resisted arrest and approached officer with rock in upraised arms).

[14] Gelhaus raises two additional objections.  First, Gelhaus contends that the district court "erroneously relied more on the outdated and limited *Garner* case" than it did on *Graham*.  The court plainly applied *Graham*, however, and we have observed in any event that *Tennessee v. Garner*, 471 U.S. 1 (1985), provides "guidance" for the excessive force

*C. The dissent misconstrues the facts we must presume for purposes of this interlocutory appeal.*

The dissent proceeds from a different starting point and consequently ends with a different conclusion. The dissent's analysis, however, is flawed because it is premised on a misreading of the district court's factual finding regarding the movement of Andy's gun.

The dissent first rewrites the district court's finding. It declares that Andy was "facing the officer and the gun [wa]s beginning to rise," such that Gelhaus was forced to fire his weapon in a circumstance where Andy's gun, "while rising, had not yet risen to a point where it could have shot either deputy." In the dissent's view, Gelhaus was in a duel, and avoided imminent peril only by firing at Andy *just* before

---

inquiry "tailored to the application of deadly force." *George*, 736 F.3d at 837.

Next, Gelhaus insists that whether his use of force was reasonable is a pure question of law, and that the district court erred in calling it a triable issue of fact. But Gelhaus's argument elides two issues. Gelhaus moved for summary judgment on the Fourth Amendment claim, prompting the district court to correctly find a triable issue of fact as to the reasonableness of the force used. Then, Gelhaus "separately argue[d]" that he is entitled to qualified immunity, prompting the district court to separately analyze that defense. At step one, the district court incorporated its earlier analysis of the motion for summary judgment on the Fourth Amendment claim. Because it found a triable issue of fact as to reasonableness, the court necessarily held that a reasonable jury could find that Gelhaus's conduct was unconstitutional when viewing the evidence in the light most favorable to plaintiffs. The court therefore discussed only step two in its separate section on qualified immunity. It concluded that the law was "clearly established" that Gelhaus's conduct was unconstitutional. Thus, the district court made the legal determination that Gelhaus now requests.

Andy fired at him.  The dissent also apparently believes that the district court not only made this factual finding, but then made the rather inexplicable decision to ignore this obvious threat in its qualified immunity analysis.  To be sure, if those were the facts, it would be hard to see how the district court could have denied summary judgment on the Fourth Amendment claim and on qualified immunity.  But those were not the facts the district court found.

On the contrary, the imminent threat the dissent portrays is the precise type of situation the district court *distinguished* in the course of making its factual finding.  This conclusion is unmistakable in light of the cases the district court discussed in its analysis.  For instance, it first distinguished *Billington*, which it said involved an imminent threat because "the suspect was 'locked in hand-to-hand combat' with a police detective," was "trying to get the detective's gun," and "was getting the upper hand." *Lopez*, 149 F. Supp. 3d at 1158–59 (quoting *Billington*, 292 F.3d at 1185).  The court next distinguished *Reynolds*, where the suspect "made a sudden, backhanded, upward swing toward [the officer] with his right hand, which was holding [a] knife." *Id.* at 1159 (quoting *Reynolds*, 84 F.3d at 1164 (first alteration in original)).  *Scott* came next, where the suspect stood in a doorway and pointed a gun directly at two police officers. *Id.* (citing *Scott*, 39 F.3d at 914).  The district court then distinguished *Garcia*, where a suspect drew close to an officer and brandished a "rock with upraised arms." *Id.* (quoting *Garcia*, 826 F.2d at 808).  Finally, the court distinguished *Lal*, where a suspect "kept advancing" at the officers while "holding a football-sized rock over his head," and forced them to fire when he was barely one yard away— a time when the officers "reasonably believed that [the suspect] would heave the rock at them." *Id.* at 1159–60 (quoting *Lal*, 764 F.3d at 1117).

Synthesizing these precedents, the district court said that in each of these cases, an object was "used to directly threaten an officer before deadly force was used." *Id.* at 1160. By contrast, it found that "Defendants cannot point to *any* similarly-threatening behavior on Andy's part." *Id.* (emphasis added). This finding debunks the dissent's version of the shooting. But the district court didn't stop there. It expressly added that it was "mindful of the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 1162 (internal quotation marks omitted), and nevertheless found that Gelhaus was not entitled to summary judgment because such a judgment is warranted where a suspect exhibits "threatening, aggressive, or erratic behavior" and "this case involves *none* of those facts," *id.* (emphasis added).

The dissent's misreading of the district court's finding is evident for at least two additional reasons. First, the duel the dissent envisions conflicts with the district court's repeated statement that Andy did not "point the weapon at the officers *or otherwise threaten them with it.*" *Id.* at 1164 (emphasis added). Of course, if we cast aside the dissent's interpretation and view this statement with the benefit of the above context, its meaning is clear: Andy did not point his weapon at the officers—in contrast to the facts of *Scott*—and the movement of Andy's weapon did not pose any imminent threat to Gelhaus—in contrast to the circumstances in *Billington*, *Reynolds*, *Garcia*, and *Lal*.

Second, whereas the dissent revises the district court's finding to assert that Andy was "facing the officer and the gun [wa]s beginning to rise," the district court distinguished between the movement of Andy's gun at the instigation of

the turn and during the remainder of the interaction. The court stressed how the defendants had used "carefully-phrased language . . . saying only," for instance, that the barrel was coming "up and around in their direction" "as Andy turned around." *Lopez*, 149 F. Supp. 3d at 1158. The court also knew that Gelhaus had shot Andy in the chest, so Andy had completed his movement when Gelhaus opened fire. It then focused directly on the *starting* position of the gun, when Andy had his back to the officers, and emphasized that it was obligated to view the evidence in the light most favorable to the plaintiffs. "[I]n that light," the court said it could "conclude only that the rifle barrel was beginning to rise; and given that it started in a position where it was pointed down at the ground, it could have been raised to a slightly-higher level without posing any threat to the officers." *Id.* at 1162. The dissent strips this finding of the vital context that the gun began to rise in connection with Andy's turn. But with that necessary context, the district court's interpretation of the record is apparent: it found that even if the gun "began" to rise at the start of Andy's turn (when it was pointed straight down at the ground), as one's arm naturally swings in the course of a turn, it did not necessarily rise throughout the whole interaction, and could have been raised only to a "slightly-higher level" that was non-threatening to Gelhaus. The court's reading of *Anderson* confirms this. In the paragraph immediately preceding its finding, it distinguished *Anderson* by stating that "mere possession of a weapon is not sufficient to justify the use of deadly force," and by concluding that, unlike the suspect in *Anderson*, Andy was "holding a weapon pointed down at his side, and merely turned around in response to an officer's command." *Id.* at 1161–62.

Taken in the appropriate context, and in consonance with our duty "to determine what facts the district court, in the

light most favorable to the nonmoving party, likely assumed," *Watkins*, 145 F.3d at 1091, the proper reading is that the district court could "conclude only that the rifle barrel was beginning to rise [at the outset of Andy's turn]; and given that it started in a position where it was pointed down at the ground [when Andy had his back to the officers], it could have been raised [by Andy's natural turning motion] to a slightly-higher level without posing any threat to the officers." *Lopez*, 149 F. Supp. 3d at 1162. Put differently, as Andy turned around, the weapon could incidentally have risen only "to a slightly-higher level [that did not] pos[e] any threat to the officers." *Id.*

This is the best reading of the district court's factual finding for several reasons. First, unlike the dissent's interpretation, it echoes the district court's description of the event. Second, unlike the dissent's interpretation, it is congruent with the district court's analysis explicitly distinguishing the five aforementioned cases involving impending threats. Third, unlike the dissent's interpretation, it explains the district court's finding that Andy did not "point the weapon at the officers *or otherwise threaten them with it*." *Id.* at 1164 (emphasis added). It also explains the district court's conclusion that the "defendants have not established that Andy actually threatened the officers with the rifle that he was holding." *Id.* at 1158.

Lastly, unlike the dissent's interpretation, the record supports this reading for purposes of summary judgment. Plaintiffs' adduced evidence, for instance, that included three-dimensional models of Andy's movements depicting, frame-by-frame, how Andy's fully-extended left arm would have appeared when he had his back to the deputies, and how the gun could have been raised only to a "slightly-higher level" as Andy's elbow slightly flexed as he naturally turned

around. In addition, there was Gelhaus's reenactment in the video, Gelhaus's admission that the gun had been benignly swinging (and thus not only rising but also falling) with Andy's natural motions, Gelhaus's admission that he had no knowledge of where Andy's gun was pointing when he elected to shoot, and the fact that neither Gelhaus nor Schemmel ever stated how much the barrel began to rise as Andy turned. The dissent's interpretation relies on the assumption that Andy's gun was continuously rising throughout the interaction, such that it imposed an imminent threat forcing Gelhaus to shoot just before Andy's weapon was pointed directly at him. Under our summary judgment jurisprudence, however, the district court was required to assume that all factual disputes would be resolved, and all reasonable inferences would be drawn, in plaintiffs' favor. In light of the plaintiffs' evidence, the record cannot support the dissent's version of the event for purposes of summary judgment.[15]

---

[15] The dissent's attempt to impugn the plaintiffs' evidence is unavailing. Regarding the plaintiffs' expert report, the dissent posits that a jury could learn nothing about the movement of Andy's gun from the gun's position at the moment the bullets entered Andy's body—as if the gun's position could meaningfully have changed in the time that it took the bullets to exit the chamber and travel twenty yards. That does not make sense. The gun's position when the bullets struck Andy is obviously informative of the gun's likely movement in the prior moment. In any event, the report depicts the likely movement of Andy's gun as he turned to face the officers, and how the gun could have been raised only to a non-threatening level as Andy's elbow slightly flexed with his natural motion. Next, the benign swinging of the gun with Andy's natural steps is also informative of the gun's likely movement because the plaintiffs' expert report shows that Andy must have taken multiple steps as he turned to face the officers. Lastly, the dissent would cast aside the strong circumstantial evidence that Gelhaus had no knowledge of where Andy's gun was pointing when he elected to shoot, and the fact

In sum, the dissent's accusations are as seismic as they are unconvincing.  Moreover, the dissent's analysis is flawed because it rests upon a misreading of the district court's factual finding regarding the movement of Andy's gun.  It bears repeating: even though we must assume for purposes of this interlocutory appeal that the barrel "began" to rise as Andy turned, we must also assume—as the district court expressly found—that it potentially rose, as an incident of Andy's turning motion, only "to a slightly-higher level [that did not] pos[e] any threat to the officers."  *Id.* at 1162.  Mindful of that possibility, and viewing the evidence in the light most favorable to the plaintiffs, the district court found that Andy did not "point the weapon at the officers *or otherwise threaten them with it*."  *Id.* at 1164 (emphasis added).  And that is why, taking the facts as we must regard them, a reasonable jury could find that Gelhaus deployed deadly force while Andy was merely standing on the sidewalk holding a gun that was pointed down at the ground.  This conclusion echoes the district court's findings, which govern this interlocutory appeal.  By contrast, the dissent's version of the event violates a fundamental principle of our summary judgment jurisprudence—that "all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor," *George*, 736 F.3d at 836—and selectively accepts Gelhaus's word at face value with respect to the movement of Andy's gun, thereby contravening *Cruz*.  *See* 765 F.3d at 1079 ("[I]n the deadly force context, we cannot

---

that neither Gelhaus nor Schemmel ever stated how much the barrel began to rise as Andy turned.  However, where "the only witness other than the officers was killed during the encounter," courts have a duty to "examine circumstantial evidence that, if believed, would tend to discredit the police officer's story."  *Gonzalez*, 747 F.3d at 795.  That is precisely what the district court had here.  Therefore, this evidence properly informed the district court's summary judgment determination.

simply accept what may be a self-serving account by the police officer." (internal quotation marks omitted)).

## II. Step Two—Whether the right was clearly established.

"Under the second prong of the qualified immunity test, we ask whether the alleged violation of [Andy's] Fourth Amendment right against excessive force was clearly established at the time of the officer's alleged misconduct." *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016) (internal quotation marks omitted). If not, Gelhaus is entitled to qualified immunity on the excessive force claim. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft*, 563 U.S. at 741 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[16] *Id.*

In *White v. Pauly*, 137 S. Ct. 548 (2017), the Supreme Court recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" (quoting *Ashcroft*, 563 U.S. at 742). Rather, "the clearly established law must be 'particularized'

---

[16] "[T]his Court has [also] acknowledged that qualified immunity may be denied in novel circumstances." *Hughes*, 841 F.3d at 1088. "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1286.

to the facts of the case." *Id.* (quoting *Anderson*, 483 U.S. at 640). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Saucier*, 533 U.S. at 205).

In accordance with these instructions, the district court asked whether the law was clearly established such that an officer on October 22, 2013, would have known that the use of deadly force was unreasonable "where the suspect appears to be carrying an AK-47, but where [the] officers have received no reports of the suspect using the weapon or expressing an intention to use the weapon, where the suspect does not point the weapon at the officers or otherwise threaten them with it, where the suspect does not 'come at' the officers or make any sudden movements towards the officers, and where there are no reports of erratic, aggressive, or threatening behavior." *Lopez*, 149 F. Supp. 3d at 1164. The district court held that the law was clearly established that under those circumstances, Gelhaus's use of deadly force was unreasonable. *Id.* It did not identify a specific precedent that put Gelhaus on notice that his conduct was unconstitutional.

The district court erred by failing "to identify a case where an officer acting under similar circumstances as [Deputy Gelhaus] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. However, *George*

*v. Morris* serves that function. *Harris* and *Curnow* were also on the books to provide Gelhaus with guidance.[17]

> A. *Taking the facts as we must regard them on this interlocutory appeal, the law was clearly established at the time of the shooting that Gelhaus's conduct was unconstitutional.*

In *George*, the suspect was a sixty-four-year-old male with terminal brain cancer. 736 F.3d at 832. He awoke in the middle of the night, retrieved his gun, and loaded it with ammunition. *Id.* His wife called 9-1-1 and could be heard on the recording exclaiming "No!" and "My husband has a gun!" *Id.* Three deputies were then "dispatched to the residence for a domestic disturbance involving a firearm." *Id.* The wife met the deputies at the front door, advised them "not to scare her husband," and said that he was on the back patio "with his gun." *Id.* The officers set up a perimeter in the backyard. *Id.* Soon after, they saw the husband open the

---

[17] The dissent conjures its own "framing"—"that the use of deadly force without an objective threat is unreasonable"—and criticizes the use of that fictitious frame to the extent that it applies here. We employ no such frame. Nor do we rely on general excessive force principles. Rather, we ask whether the law was clearly established that the use of deadly force was unreasonable in a situation where the factual predicates enumerated in Part I.B are assumed to be true. Somewhat distilled, this is a situation where, among other things, "the suspect appears to be carrying an AK-47, but where [the] officers have received no reports of the suspect using the weapon or expressing an intention to use the weapon, where the suspect does not point the weapon at the officers or otherwise threaten them with it, where the suspect does not 'come at' the officers or make any sudden movements towards the officers," where the officers do not witness any "erratic, aggressive, or threatening behavior," and where the suspect was not warned that deadly force would be deployed despite the officers having ample opportunity to do so. *Lopez*, 149 F. Supp. 3d at 1164.

door to the second-floor balcony. *Id.* "Once he appeared in view of the deputies," the officers identified themselves as law enforcement and instructed the husband to show his hands. *Id.* The husband was using a walker and—as Gelhaus attests Andy was doing here—was holding a gun in his left hand "with the barrel pointing down." *Id.* At this point, an officer testified that the husband "turn[ed] straight east and raise[d] [the gun]" and "point[ed] it directly at [him]," prompting the officer to fire. *Id.* at 833 n.4. However, there was reliable evidence to support the plaintiff's version of the event, so we did not "credit the deputies' testimony that [the husband] turned and pointed his gun at them." *Id.* at 838. We also assumed that the husband did not take "other actions that would have been objectively threatening." *Id.* On those facts, where the deputies shot the decedent "without objective provocation while he used his walker, with his gun trained on the ground," *id.* at 839, we held that "a reasonable fact-finder could conclude that the deputies' use of force was constitutionally excessive," *id.* at 838.

*George* mirrors the facts here, and indeed, involved circumstances that were far more objectively threatening than those in the present case. In other words, Gelhaus's alleged use of deadly force was *more* objectively *un*reasonable than the Fourth Amendment violation identified in *George*. For instance, the officers in *George* responded to a report of a possible crime. 736 F.3d at 839. By contrast, Gelhaus discovered Andy while on routine patrol. He was not responding to a potential crime that might have caused him to be especially concerned for his safety. Next, the officers in *George* knew that the husband was acting erratically. The wife specifically warned them "not to scare her husband." *Id.* at 832. Here, by contrast, the officers described Andy as composed and non-threatening

immediately prior to the shooting.  Next, the officers in *George* identified themselves explicitly as law enforcement. *Id.*  The notion that the husband disobeyed their command thus was fairly plausible.  Here, Gelhaus's shout was the first moment that Andy became aware that someone was behind him.  Andy also did not know that the person who shouted was a police officer, and could not be certain that the call was even directed at him.

As for similarities, in *George*, as here, the officers failed to warn the victim despite having the opportunity to do so. Further, in *George*, as here, the victim allegedly held a gun in his left hand with the barrel of the weapon pointing down. Next, in *George*, as here, the barrel of the weapon did not rise to a position that posed any threat to the officers.  Lastly, in *George*, as here, the victim did not take "other actions that would have been objectively threatening."  736 F.3d at 838. At bottom, taking the facts as we must regard them at this stage of the proceedings, Gelhaus, like the deputies, shot without warning, without objective provocation, and while the gun was trained on the ground.  Because *George* "squarely governs" the circumstances that Gelhaus confronted, Gelhaus violated Andy's clearly established right to be free of excessive force in this context.[18] *Mullenix*, 136 S. Ct. at 310 (quotation marks omitted).

---

[18] The dissent's application of *George* is flawed because it is premised on the erroneous assumption that Andy's gun barrel was continuously rising throughout the interaction.  The dissent fails to heed the Supreme Court's admonition "not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."  *Tolan*, 134 S. Ct. at 1866.  The dissent also fails to explain how turning naturally and non-aggressively while holding a gun pointed down at the ground amounts to "manipulating" the gun.  In any event, the argument is a red herring.  Even though we must assume that the barrel "began" to rise as

Though *George* is sufficient, *Harris* and *Curnow* also gave Gelhaus warning that his use of deadly force was not objectively reasonable. In *Harris*, an FBI agent was instructed to shoot any armed male near a particular home. 126 F.3d at 1202. The officer saw a suspect returning to the home who he believed had killed an FBI agent the previous day. *Id.* at 1203. While perched safely on a hill, the agent shot the suspect without warning, without the opportunity to surrender, and despite the fact that the suspect had made no threatening movement of any kind. *Id.* at 1203. We said that the law was clearly established that the use of deadly force in that circumstance was not objectively reasonable. *Id.* "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Id.* at 1204. On the facts as we must regard them, that statement put Gelhaus on notice that his use of deadly force was constitutionally excessive.

In *Curnow*, the police broke down a suspect's front door because they believed the suspect had injured a woman inside. 952 F.2d at 323. As they entered the house, the suspect was standing next to an assault weapon. *Id.* (statement of Mercedes Taylor). An officer outside then shot the suspect in the back as the other police officers entered. *Id.* We held that "the police officers could not reasonably have believed the use of deadly force was lawful because [the victim] did not point the gun at the officers and apparently was not facing them when they shot him the first time." *Id.* at 325. *Curnow* is not identical to the present circumstances because the victim in *Curnow* was not holding

---

Andy turned, we must further assume that that it could have risen, as part of the natural turning motion, only "to a slightly-higher level [that did not] pos[e] any threat to the officers." *Lopez*, 149 F. Supp. 3d at 1162.

the gun. *See id.* at 323, 325. Still, it gave Gelhaus "fair notice" that the use of deadly force is unreasonable where the victim does not directly threaten the officer with the gun. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

In light of *George*, *Harris*, and *Curnow*, and taking the facts as we must regard them at this stage of the proceedings, there is no room for Gelhaus to have made "a reasonable mistake" as to what the law required. *See Saucier*, 533 U.S. at 205 ("If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."). Qualified immunity may also apply, however, where the government official makes a reasonable "mistake of fact." *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). Here, Gelhaus could not have reasonably misconstrued the threat allegedly posed by the position of Andy's gun because, on the facts as we must regard them, it never rose to a position that posed any threat to the officers. Accordingly, the only question is whether Gelhaus could have reasonably misconstrued Andy's turn as a "harrowing gesture." *See George*, 736 F.3d at 838 ("If the person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). As to that determination, we must avoid "the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, but remain mindful that "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury," *Deorle*, 272 F.3d at 1281.

Based on the present record, Gelhaus could not reasonably have misconstrued Andy's turn as a "harrowing gesture." First, Gelhaus describes Andy as walking normally and appearing composed and non-threatening

immediately prior to turning. Gelhaus also believed that Andy looked like a teen and did not look like a gang member. Gelhaus has not described Andy's turn as abrupt, and the district court expressly found that Andy did not "make any sudden movements towards the officers." *Lopez*, 149 F. Supp. 3d at 1164. This makes sense because, to Gelhaus's knowledge, Andy was not aware that someone was behind him until Gelhaus shouted "drop the gun." Gelhaus had not received any report suggesting that Andy was dangerous or intended to use the weapon. Indeed, when he came across Andy, the weapon itself was pointed straight down at the ground. Gelhaus never identified himself as a police officer, so Andy could not have consciously disobeyed a law enforcement order. Lastly, as Andy engaged in the turn, the position of the gun barrel never posed any threat to Gelhaus. In short, prior to and during Andy's turn, Gelhaus simply did not witness *any* threatening behavior. Thus, the only reasonable inference is that Andy was turning naturally and non-aggressively to look at the person who shouted from behind. If anything, Gelhaus should have *expected* Andy's turn, for it did not contravene Gelhaus's command, and it may have been an effort to comply. Turning is also the most natural reaction when someone yells in your direction from behind.

Gelhaus objects to this analysis, arguing it has not been clearly established "that law enforcement officers have to determine at what angle a suspect needs to turn and raise an assault weapon in their direction before they can lawfully use deadly force." However, this argument not only overlooks *George*, but is predicated on assuming two facts that we cannot assume on this interlocutory appeal: First, that Andy's turn was an aggressive gesture even though it was not sudden; second, that the gun rose to a position that posed a threat to the officers. Taking the facts as we must

regard them, Andy did not pose an immediate threat to Gelhaus or Schemmel.

Next, Gelhaus insists that the court improperly placed the burden on *him* to show that existing precedent allowed his conduct, *see Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002) (explaining that plaintiff bears the burden of proving the right allegedly violated was clearly established at the time of the violation, and if plaintiff meets the burden, defendant bears the burden of establishing that the defendant reasonably believed his conduct was lawful), and failed to afford breathing room for Gelhaus to make a reasonable but mistaken judgment. There is no evidence to support the former argument. The latter argument is foreclosed in light of *George*, and because there is no room for "a reasonable mistake" as to what the law required on the facts as we must regard them.

>  **B. Ultimately, Gelhaus's entitlement to qualified**
>     **immunity depends on disputed facts that must be**
>     **resolved by a jury.**

"While we have held that qualified immunity is to be determined at the earliest possible point in the litigation, we have also held that summary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." *Liston v. Cty. of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997) (internal quotation marks and citation omitted). Based on the present record, the latter scenario applies here.

If the jury finds, for instance, that Andy briefly glanced backwards and was aware that the officers were following him, it may find that he intentionally disobeyed the order to drop the gun, that he turned aggressively, and that his

weapon was not pointed at the ground. On those facts, even if Gelhaus committed a Fourth Amendment violation, his conduct likely did not violate clearly established law given that "a furtive movement, harrowing gesture, or serious verbal threat" can justify deadly force against someone who is armed. *George*, 736 F.3d at 838. Conversely, if plaintiffs' version of the facts prevails and the jury concludes that Andy posed no imminent threat to the officers, then Andy's right to be free of excessive force in this context was clearly established at the time of Gelhaus's conduct. *See id.*; *Harris*, 126 F.3d at 1204; *Curnow*, 952 F.2d at 325.

Because Gelhaus's entitlement to qualified immunity ultimately depends on disputed factual issues, summary judgment is not presently appropriate. *See Hughes*, 841 F.3d at 1090 (denying summary judgment where the "application of qualified immunity" "depend[ed] upon the facts as determined by a jury"); *Martinez v. Stanford*, 323 F.3d 1178, 1184–85 (9th Cir. 2003) (the "facts in dispute bearing on the question of qualified immunity" made summary judgment on that ground inappropriate); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (declining to grant qualified immunity "because whether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend upon the jury's resolution of disputed facts and the inferences it draws therefrom" (citation omitted)).

## CONCLUSION

We AFFIRM the district court's order denying defendants' motion for summary judgment on the defense of qualified immunity, and REMAND for trial. Appellants shall bear costs on appeal. Fed. R. App. P. 39(a)(2).

WALLACE, Circuit Judge, dissenting:

The facts of this case are tragic. A boy lost his life—needlessly, as it turns out. We know now that he was carrying only a fake gun, albeit a realistic-looking one. Deputies Gelhaus and Schemmel therefore never were in any real danger and deadly force was not necessary. In view of these facts, the inclination to hold Deputy Gelhaus liable for shooting Andy Lopez is understandable. But it is a well-settled rule that a court may do so only if precedent clearly established at the time of the shooting that the use of deadly force in the circumstances Deputy Gelhaus faced was objectively unreasonable. I do not agree with the majority that such a case existed on the day Andy died. Respectfully, I therefore dissent.

## I.

The majority opinion exhaustively recounts the facts of the case, but for me, they are largely irrelevant. One critical fact—the upward motion of the fake gun—resolves the qualified immunity issue in Deputy Gelhaus's favor. In reaching the opposite conclusion, the majority accuses me of making an assumption regarding this fact that is improper at the summary judgment stage. I have done no such thing. In fact, as I explain below, it is the majority whose position is unsupported by the record. For contextual purposes, and to rebut any contrary implication in the majority opinion, I also will explain why the statements of Jose Licea, who testified regarding the appearance of Andy's fake gun, do not affect the qualified immunity analysis.

## A.

As the majority concedes, we must accept the district court's finding that the barrel of the gun "was beginning to

rise." The majority also accepts the district court's additional finding that the gun "could have been raised to a slightly-higher level without posing any threat to the officers." Based on the latter finding, I agree with the majority that we must assume the gun was not in fact pointed at the officers at the moment Deputy Gelhaus opened fire. As the majority says, neither Deputy Gelhaus nor Deputy Schemmel testified how high the gun barrel rose, but both stated that they believed they were in imminent danger as a result of the gun's movement. This evidence shows that the deputies at least perceived that the weapon posed a threat at the height to which it had then risen. Their perception is not dispositive, however, and there is other evidence in the record (and the district court's finding) that the gun, while rising, had not yet risen to a point where it could have shot either deputy. I agree with the majority, therefore, that the precise angle at which Andy pointed the gun is a disputed fact, but as I explain below, that fact is not material to the qualified immunity analysis.

The majority attempts to discount the district court's finding that the gun barrel was beginning to rise. For instance, in summarizing the facts in the light most favorable to the plaintiffs, the majority says that "[Deputy] Gelhaus deployed deadly force while Andy was merely standing on the sidewalk holding a gun that was pointed down at the ground." This description does not characterize fairly the situation that Deputy Gelhaus faced. A gun pointed at the ground and one that is rising are qualitatively different. By casting the latter as the former, the majority goes beyond viewing the facts in the light most favorable to the plaintiffs and ignores a critical fact that must be accepted as true and, as I will explain, bears directly on the question of whether it was clearly established that Deputy Gelhaus's use of deadly force was unreasonable under the circumstances. The

majority repeats this error when it describes the record as showing that "as Andy engaged in the turn, the position of the gun barrel never posed any threat to [Deputy] Gelhaus" without a mention of the gun's upward motion.

The majority takes me to task for "rel[ying] on the assumption that Andy's gun was *continuously* rising throughout the interaction," an assumption that the majority believes is unsupported by the record. This criticism is puzzling for two reasons. First, I have not taken Deputy Gelhaus's "word at face value," as the majority charges. What I have done, and I was under the impression that the majority had done the same, is accept the district court's finding that the fake gun's barrel "was beginning to rise." *Estate of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154, 1162 (N.D. Cal. 2016). Not only is it not improper for me to accept this fact, it is required. *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998). The majority itself embraces this finding as one that "makes sense." So, as far as I can tell, the majority's concern is one of timing—that although the barrel may have begun to rise at some point before the shooting, it may also have ceased to rise in time for Deputy Gelhaus to recognize that Andy did not pose a threat.

This position is difficult to reconcile with the district court's finding. The district court did not find that the gun's barrel stopped moving after beginning to rise. It found only that the barrel "was beginning to rise." *Lopez*, 149 F. Supp. 3d at 1162. To the extent the majority believes some ambiguity exists as to whether the district court found that the gun was still rising immediately before Deputy Gelhaus shot Andy, the court's legal analysis confirms my reading. It found that the gun "was beginning to rise" while distinguishing cases involving shootings preceded by actions that, from the district court's perspective, were more

threatening. *Id.* If the district court wanted to distinguish those cases on the basis that Andy's action was not sufficiently threatening, it would make little sense to find that the gun barrel was "beginning to rise" if there was room to find instead that the gun barrel had stopped rising. Therefore, the most natural reading of the district court's finding, and the only reasonable one, is that the gun was beginning to rise (i.e., in the process of rising) immediately before Deputy Gelhaus shot Andy.

This brings us to the second flaw in the majority's argument, which is that it is completely unsupported by the record. The majority speculates that the gun may not have been rising at the time Deputy Gelhaus committed to firing his weapon. Contrary to the majority's contention, however, nothing in the record before us supports this proposition. The majority's reliance on the three-dimensional models created by the plaintiffs' expert is misplaced. Those models are components of the expert's analysis of Andy's likely body posture at the time he was struck by the bullets. As such, they necessarily concern only what occurred *after* Deputy Gelhaus first fired his weapon and thus cannot serve as evidence of the gun's motion even at the moment of the shooting, much less at the time Deputy Gelhaus became committed to using deadly force. With respect to Deputy Gelhaus's purported admission "that the gun had been benignly swinging . . . with Andy's natural motions," it is true that Deputy Gelhaus stated that none of Andy's "motions" during the time leading up to the confrontation seemed aggressive, and that the gun would "swing somewhat" as Andy walked. Even granting that the gun was moving in this way while Andy was walking away from the police car, however, that fact does not tell us how the gun moved when Andy stopped walking and engaged in an

entirely different motion—namely, turning to face Deputy Gelhaus.

The majority has thus identified no evidence that even suggests that the gun had stopped rising at the time Deputy Gelhaus resorted to deadly force. This dearth of support might explain why the plaintiffs themselves have never made such an argument, preferring instead to contest whether the gun began to rise at all. Even the majority seems to recognize that the evidentiary foundation for its argument is lacking, as it does not claim that the evidence just discussed in fact supports a finding that the gun stopped rising. Instead, the majority asserts only that this evidence is reason to doubt my "assumption" (which really is nothing more than a reasonable, natural reading of the district court's finding) in the abstract. To reach its ultimate conclusion, the majority cites Deputy Gelhaus's statement that he did not know where Andy's gun was pointing when he pulled the trigger and declares that the gun "did not necessarily rise throughout the whole interaction." At bottom, then, the majority's argument rests on the bare absence of evidence definitively disproving the existence of alternate facts for which there is no record. My "seismic" "accusations," as the majority calls them, are a straightforward reading of the district court's finding.

This novel rule—that we must accept as true all facts not conclusively disproved by evidence in the record even if those facts have no evidentiary support of their own—is plainly wrong. We need only "assume the truth of the *evidence set forth by the nonmoving party* with respect to [a] fact" when "direct evidence produced by the moving party conflicts with direct *evidence produced by the nonmoving party*." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) (emphasis added).

The record before us contains evidence (not to mention the district court's finding) that the gun was beginning to rise, but no evidence showing that the gun then stopped rising before the shooting started. The mere possibility that a jury might disbelieve a moving party's undisputed evidence is not enough to avoid summary judgment. *See id.* at 630 ("[T]he nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim"). What the majority has done here is to conjure up "some metaphysical doubt as to the material facts"—a step that not even the district court took—and affirm the denial of summary judgment on that basis. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

This attempt to avoid the conclusion that the gun was rising at the time Deputy Gelhaus decided to use deadly force is unpersuasive, but also unsurprising. As discussed below, none of the cases the majority cites to show that Deputy Gelhaus violated Andy's clearly established right addressed a situation where the victim's gun "was beginning to rise" toward the officer. So to make those cases fit, the majority must eliminate this crucial differentiating fact. Perhaps knowing that the district court's finding of fact cannot so casually be cast aside, the majority unpersuasively attempts to parse the district court's language to create a distinction between the gun's initial motion and its continuing motion and concludes that the district court's finding pertains only to the first. This clever argument leaves the majority free to attribute any conclusion about the second to some other source—here, Deputy Gelhaus's account—and then chide me for misunderstanding the rules of summary judgment. Unfortunately for the majority, nothing in the district court's order reflects that it even considered

this dichotomy, let alone structured its factual findings
around it.

But the majority does not stop there. It then subtly
revises the district court's finding to make it appear
consistent with this new reading. According to the majority,
the district court found that "the barrel of the weapon could
incidentally have risen, as part of the natural turning motion,
only 'to a slightly-higher level [that did not] pos[e] any
threats to the officers.'" Tellingly, the majority inserts
"only" here in nearly every place (seven to be exact) that it
purports to quote or paraphrase this finding. This seemingly
innocuous insertion greatly distorts the finding in a way that
supports the majority's argument. On this reading, the
district court made a finding that, at the time Deputy Gelhaus
committed to using deadly force, the gun could *not* have
risen to a level where it threatened the officers. Had the
district court made this finding, it would indeed support the
majority's argument. But this alteration is important. What
the district court actually found was that "the rifle barrel was
beginning to rise; and given that it started in a position where
it was pointed down at the ground, it could have been raised
to a slightly-higher level without posing any threat to the
officers." *Lopez*, 149 F. Supp. 3d at 1162. This language
paints a different picture: far from concluding that the gun
could not rise further, the district court found that the rising
motion was not necessarily sufficient to put the gun in a
position where it was pointed at the officers. If anything,
then, the language that the district court actually used
reinforces the notion that it found that the gun was moving
when Deputy Gelhaus decided to fire his weapon. In
addition, even under the majority's distorted reading, the gun
was necessarily pointed somewhere between the ground and
Deputy Gelhaus, by virtue of it "beginning to rise" after
having been "pointed down at the ground." Therefore, the

gun was not "trained on the ground" or "pointed down at the ground" at the time Deputy Gelhaus pulled the trigger as the majority claims.

The majority says it is deferring to the district court's findings, but it is not. Rather than perform these interpretive changes, I would take the district court at its word and decide this appeal on the understanding that the gun was beginning to rise when Deputy Gelhaus committed to using deadly force.

B.

The majority also fails to appreciate the apparent threat posed by the gun from Deputy Gelhaus's perspective. The record is replete with evidence that Deputy Gelhaus did not realize and could not have discerned that Andy was carrying a fake gun instead of an authentic AK-47. First, it is undisputed that the gun was missing the bright orange tip required by federal law. 15 U.S.C. § 5001(b)(1). This tip immediately would have identified the gun as a fake; conversely, its absence would suggest to an observer that the gun was real.

Second, Deputy Gelhaus, who had experience with AK-47s both as a deputy and during his time serving in the United States Army, testified that he believed Andy was carrying a real AK-47 and that "[t]here were no unusual markings or colorings on the weapon which were visible to [him] which indicated that the weapon was anything other than an AK[-]47 assault weapon." Furthermore, he testified that it was not until after the shooting, when he was close to the gun, that he was able to recognize that it was not a real rifle.

We cannot simply take Deputy Gelhaus's word, however. As the majority counsels, we must instead "carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014), *quoting Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Here, there is expert testimony that it was not possible for Deputy Gelhaus to tell the difference between Andy's fake gun and a real AK-47 at the distances from which he observed it. Plaintiffs' expert does not refute this conclusion, opining only that the reenactment video upon which Deputy Gelhaus's expert relied "does not necessarily accurately depict the information available to Deputy Gelhaus prior to his decision to shoot [Andy]." Notably absent is any direct evidence that a reasonable officer in Deputy Gelhaus's position *would* have been able to differentiate between the fake and the real thing.

The majority's factual exposition refers to statements by Jose Licea, a witness who observed Andy walking on the sidewalk before the shooting. Licea testified that, as he drove by Andy, he thought the gun "look[ed] fake." Taken at face value, his assessment of the fake gun's appearance might seem to create a genuine dispute of material fact. A bit of digging, however, reveals that Licea's perception was based largely on facts and circumstances unique to him. For example, he qualified his statement that he thought Andy was carrying a BB gun by explaining that someone had recently shot a window at his house, after which his mother-in-law observed some children with BB guns in the area. There was no reason for Deputy Gelhaus to know this fact, so it should play no part in the analysis. *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 550 (2017) (per curiam) ("Because this case concerns the defense of qualified immunity, . . . the

Court considers only the facts that were *knowable to the defendant officers*" (emphasis added)).

Licea's perception of the fake gun was also influenced by his assumption that no one would be carrying an AK-47 during the daytime. "[T]hat's something for the night," he asserted. Putting aside the reasonableness of this assumption as a general matter, it is not one that a reasonable officer in Deputy Gelhaus's position would have shared, given that the area had a very high concentration of weapons-related violent crime and Deputy Gelhaus himself previously had confiscated an authentic AK-47 within a mile of the site of the shooting. Licea's assumption therefore should be discounted as well.

Other than these two personal reasons, Licea offered no basis for his conclusion that the gun appeared not to be real. Most importantly, he did not identify anything about *the gun itself* that gave him that impression. The only time he mentioned the gun's appearance—which is the only information that was available to Deputy Gelhaus—was a remark that its shape and design, particularly with respect to the clip, "made it look like an AK-47." Because Licea's opinion that the gun looked fake is grounded not in objective facts, but rather in his own idiosyncratic understandings, it does not create a genuine dispute of material fact with respect to whether a reasonable officer in Deputy Gelhaus's position would have been able to distinguish between Andy's replica and a real AK-47.

This conclusion is not inconsistent with our limited role in reviewing the denial of qualified immunity on summary judgment. It is true that "[a]ny decision by the district court 'that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal.'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir.

2013), *quoting Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009). In fact, the district court made no such decision with respect to Deputy Gelhaus's ability to discern that the gun was not real. Instead, the district court stated first that it was setting that issue aside, *Lopez*, 149 F. Supp. 3d at 1158 n.1, and then later that "even assuming the reasonableness of that belief [that the fake was a real gun], qualified immunity is still not warranted." *Id.* at 1164 n.2. Nowhere did the district court say that there was a genuine dispute of material fact regarding the possibility of identifying the gun as a fake. We therefore are not constrained in our analysis of that issue.

If anything, the district court's assumption that Deputy Gelhaus's perception was reasonable points in the other direction. Where there is a genuine dispute of material fact, the "facts *must* be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added). Clearly it would have been more favorable to the plaintiffs if Deputy Gelhaus *un*reasonably perceived the fake gun to be real, so if the district court believed there was a genuine dispute of material fact on that issue, it was obliged to so construe the facts. We presume that district courts follow the law, *United States v. Cervantes-Valenzuela*, 931 F.2d 27, 29 (9th Cir. 1991), and nothing in the record before us suggests that the contrary is true in this case. There is therefore no reason to depart from the district court's decision to assume that Deputy Gelhaus reasonably believed the gun to be real.

In sum, I reject the false dichotomy the majority has created with respect to the movement of the gun. The district court found that the barrel was "beginning to rise" without distinguishing between an initial rising motion and a continuing rising motion. I would adhere to that finding. Furthermore, I emphasize that there is no genuine dispute of

material fact as to whether a reasonable officer in Deputy Gelhaus's position could have recognized that the gun was not real. Finally, as the majority and plaintiffs concede, it is undisputed that Andy failed to drop the gun after officers activated the patrol car lights and siren, and yelled at him at least once to drop the gun. Accepting these facts, I turn to the question of clearly established law.

## II.

I agree with the majority's conclusion that the district court erred by failing to conduct the necessary analysis identifying a precedential case or cases it believed would have put Deputy Gelhaus on notice that his conduct was unconstitutional. *White*, 137 S. Ct. at 552. Rather than conclude there and decide the appeal, the majority attempts to perform on its own the district court's task by identifying three cases—not one of which appears anywhere in the district court's order—that purportedly served as notice to Deputy Gelhaus that he could not constitutionally use deadly force against Andy.

More important than the district court's omission, which should require reversal, is that the plaintiffs themselves have never argued that these cases clearly established Andy's right, either in response to Deputy Gelhaus's motion for summary judgment or in their answering brief on appeal. As the majority recognizes, "[t]he plaintiff bears the burden of showing that the right at issue was clearly established under this second prong" of the qualified immunity analysis. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). The majority's effort improperly attempts to carry plaintiffs' burden for them. This is yet another reason to reverse the district court.

In addition to contravening settled law, the majority's defense of the district court's incomplete holding is ultimately unsuccessful on the merits. In my view, all of the cases cited are distinguishable on their facts from the one before us and therefore cannot perform the function the majority ascribes to them, even if it were appropriate for the majority to attempt to do so.

## A.

The majority relies primarily on our case of *George v. Morris*. In that case, the defendant officer shot the victim, who was armed with a pistol and had been reported as acting erratically, after he allegedly "grasped the gun with both hands" and pointed it "directly at" the officer. 736 F.3d at 833 n.4. We could not credit the officer's account, however, because the district court had found it to be disputed. *Id.* Importantly, there was evidence in the record that "called into question whether [the victim] *ever manipulated the gun*." *Id.* at 833 (emphasis added). In the most favorable light, then, the victim did not manipulate the gun before the officer resorted to deadly force. *See id.* at 839 (describing the victim's gun as "trained on the ground"). This fact conclusively distinguishes *George* from the case before us because Andy *did* manipulate the gun—it was beginning to rise toward the deputies as he turned. Here again the majority tries unsuccessfully to evade the district court's factual finding that the gun "was beginning to rise" so that it can also avoid this manipulation issue. Since the majority is wrong on the first point for the reasons already mentioned, its second point is a non-issue.

Given the version of the facts it was required to assume, the court in *George* had no occasion to pass judgment on the use of deadly force in a situation like the one Deputy Gelhaus faced. *George* may have clearly established that using

deadly force against an armed individual is unreasonable when that person does not "ever manipulate[] the gun," *id.*, but that rule says nothing about the use of such force when someone does manipulate a gun. Indeed, our court took pains to emphasize that we were *not* considering the officer's version of events, according to which the victim had done just that. *Id.* at 833 n.4, 838.

The majority's attempt to shoehorn the facts of our case into *George* is further undercut by *George*'s pronouncement that officers need not "delay their fire until a suspect turns his weapon on them" when a person "reasonably suspected of being armed" makes "a furtive movement," a "harrowing gesture," or even a "serious verbal threat." *Id.* at 838. This passage stands for the proposition that the use of deadly force can be justified by an action less threatening than pointing a gun directly at an officer. Combining this principle with the case's holding that deadly force is not reasonable if an armed individual does not manipulate his gun, the use of deadly force against a person armed with a gun (or reasonably suspected of being so armed) becomes reasonable somewhere along the spectrum of actions between not manipulating the gun and pointing the gun at an officer. One would search in vain, however, to find the point at which that occurs in *George*. There simply was no reason to reach that issue based on the factual assumptions the court was required to make. Accordingly, *George* could not have put Deputy Gelhaus on notice that Andy's actions did not cross the threshold—wherever it may lie—at which the use of deadly force becomes reasonable. He may have been mistaken in his assessment, but he would not have known it from reading *George*.

Once this is understood, the additional aggravating factors of *George* become immaterial. Nevertheless, it bears

mentioning that the majority greatly understates the potential danger Andy posed as perceived by Deputy Gelhaus. As explained, Deputy Gelhaus reasonably believed that Andy was carrying an AK-47. With narrow exceptions, possession of such a weapon is a crime in California. Cal. Penal Code § 30605(a). Considering the undisputed destructive capabilities of an AK-47, the prevalence of weapons-related violent crimes in the area, and the fact that local gang members were known to use weapons against police to gain respect, the suspected crime cannot be considered mild. Indeed, in enacting this prohibition, the California legislature declared that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of [California]." *Id.* § 30505(a).[1] By contrast, the possible crime in *George* was less threatening. As we observed, the victim's wife, who had made the 911 call, "was unscathed and not in jeopardy when deputies arrived." *George,* 736 F.3d at 839. Furthermore, her husband "was not in the vicinity," and was instead "said to be on the couple's rear patio." *Id.*

Nor can the majority rely on *George* because it established a rule that the use of deadly force without an objective threat is unreasonable, because this framing commits the sin for which the Supreme Court repeatedly has admonished the lower federal courts: it "define[s] clearly

---

[1] That Deputy Gelhaus might have reasonably suspected that Andy was committing a non-trivial crime also bears on the first factor in the *Graham* excessive force analysis, contrary to the majority's assertion that this factor "weigh[s] clearly in Andy's favor." Because I conclude that Deputy Gelhaus is entitled to immunity because it was not clearly established that his conduct was unconstitutional, however, I would not speculate on whether a reasonable jury could find his use of deadly force to be objectively unreasonable, and do not do so here. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see also Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 309 (2015) ("The general principle that deadly force requires a sufficient threat hardly settles this matter"). The operative inquiry instead is whether there is a case that would have given notice to Deputy Gelhaus at the time of the incident that the circumstances he faced were not sufficiently threatening to warrant the use of deadly force. *See White*, 137 S. Ct. at 552 (reversing denial of qualified immunity because the court "failed to identify a case where an officer acting *under similar circumstances* as [the defendant] was held to have violated the Fourth Amendment" (emphasis added)). For the reasons already explained, *George* is not such a case.[2]

## B.

The second case cited by the majority, *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997), also fails to live up to its announced billing. *Harris* arose from the Ruby Ridge siege and involved the use of deadly force by a Federal Bureau of Investigation (FBI) sniper against the plaintiff, Harris. 126 F.3d at 1193–94. Following a shootout between United States Marshals and a group of armed civilians including Harris, "the FBI dispatched a special unit designed to deal with crisis situations," which included snipers. *Id.* at 1193. For purposes of this encounter alone, the FBI, in collaboration with the Marshal Service, rewrote its Standard Rules of Engagement. *Id.* The new rules displaced the

---

[2] The majority objects to this paragraph as employing a "fictitious frame" of its argument. There is no cause for alarm, however. I am simply pointing out that reading *George* to establish a more general rule is no more helpful to the majority's analysis than the actual facts of the case.

requirement that deadly force be used only when the target "presents an immediate risk of death or great bodily harm to the agent or another person" in favor of an instruction that "any armed adult male" "in the vicinity of the Weaver cabin could and should be killed." *Id.* (emphasis omitted).

According to the complaint, the events leading up to the shooting of Harris unfolded as follows. The day after the initial shootout, Harris accompanied Randy Weaver, the owner of the cabin under siege and the person upon whom the Marshals were attempting to serve an arrest warrant when the shootout erupted, to a shed on the property "to help minister to the body of Weaver's dead son," who had been killed in the shootout. *Id.* at 1193, 1203. While Weaver was opening the shed, an FBI sniper stationed "on a hill overlooking the Weaver cabin" shot Weaver in the back. *Id.* at 1193. Harris was armed at this point, but "made no aggressive move of any kind." *Id.* at 1203. The group immediately ran back to the cabin, where Weaver's wife, Vickie, was holding the door open. *Id.* at 1193. As Harris was entering the cabin, the sniper "fired a second shot in an effort to kill both Harris and Vickie." *Id.* at 1193–94. "The bullet passed through the clear glass in the open door, striking Vickie in the head, and after passing through her, hit Harris in the upper arm and chest." *Id.* at 1194.

The facts of our case are far afield from those in *Harris*. Unlike Deputy Gelhaus, the FBI sniper was "perched safely on a hill" when he started shooting. Unlike Andy, Harris was not turning to face the agent but rather was fleeing back into the cabin at the time he was shot. Finally, although Harris was armed, there was no indication that his weapon made any movement in the sniper's direction before the latter resorted to deadly force. Indeed, the facts as alleged made it clear that the sniper shot Harris solely because he was armed,

and that was the rule that the case established: "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others *simply because they are armed*." *Id.* at 1204 (emphasis added).

We, of course, are not dealing with a situation in which Deputy Gelhaus shot Andy merely because he was armed. Knowing that he could not use deadly force just because Andy was holding a gun would not tell Deputy Gelhaus what the Constitution required when Andy, instead of following the command to drop the gun, turned to face Deputy Gelhaus and the barrel of the rifle began to rise. *Harris* did not address such a circumstance, or even a similar circumstance, and so could not have given Deputy Gelhaus notice one way or the other as to the reasonableness of his actions. It therefore is inapposite to the question we face in this case.

## C.

The majority's final case, *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), is even less helpful in this analysis because, as the majority admits, there was evidence in that case that the victim was unarmed at the time police began shooting at him. *Id.* at 323. But that is not all: a witness to the shooting stated that the victim not only was not armed, but had not even reached for a nearby gun when an officer shot him in the back. *Id.* In the most favorable light, the victim was merely sitting in his home with his back to the officer and a gun in the vicinity. A rule that deadly force is unreasonable in those circumstances says nothing about the propriety of such force when the person is armed and facing the officer and the gun is beginning to rise. The majority suggests that this case provided "'fair notice' that the use of deadly force is unreasonable where the victim does not directly threaten the officer with the gun." Not only

is this interpretation inconsistent with *George*'s admonition that officers are *not* always required "to delay their fire until a suspect turns his weapon on them," 736 F.3d at 838, it is also inappropriate because the undisputed facts here do establish a direct threat to the officer. Thus, *Curnow* is off-point as well.

### III.

The disputed facts the majority points to—whether Andy looked backwards at the officers, whether Deputy Gelhaus yelled at Andy to drop the gun more than once, whether the patrol car chirped more than once, whether Andy held the gun in his right or left hand, and the angle between the ground and Deputy Gelhaus at which Andy pointed his gun—are simply not material to the qualified immunity analysis. Taking together the district court's findings and undisputed facts, this case involves the use of deadly force against a hooded individual armed with a replica assault rifle indistinguishable from a real one, who turned to face an officer while raising the rifle after the officer had activated his patrol car lights and siren and yelled at the individual to drop the rifle. These facts are not sufficiently similar to the facts of *George*, *Harris*, or *Curnow* to have put Deputy Gelhaus on notice that his use of deadly force violated Andy's Fourth Amendment right to be free from excessive force. *See White*, 137 S. Ct. at 552. Without these cases, the majority is left only with the statement it cites at the beginning of its clearly established law analysis: that we may deny qualified immunity "in novel circumstances." *Hughes v. Kisela*, 862 F.3d 775, No. 14-15059, 2016 WL 9226211, at *17 (9th Cir. 2016). It is doubtful how much of this statement, if any, has survived the Supreme Court's intervening decision in *White*. *See* 137 S. Ct. at 552 (stating that the Tenth Circuit's observation that the case

"present[ed] a unique set of facts and circumstances . . . . should have been an important indication . . . that [the officer's] conduct did not violate a clearly established right" (internal citation and quotation marks omitted)). To the extent it retains any vitality, it likely would be confined to those cases where the officer's conduct is an "obvious" violation of a constitutional right. *Id.*, *quoting Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001) ("When 'the defendant['s] conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established'" (quoting *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994))).

This assuredly is not such "an obvious case." *Brosseau*, 543 U.S. at 199. As shown by the majority's painstaking evaluation of the objective reasonableness of Deputy Gelhaus's use of force, this case is not obvious, but clearly quite close. Whether Deputy Gelhaus acted unreasonably turns on such minute details as how high the gun barrel had risen, whether it might have been feasible to give a warning, and just how aggressive Andy's turning motion was. By contrast, cases found to be "obvious" involve much clearer constitutional transgressions. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 734–35 (2002) (reversing grant of qualified immunity where a prisoner was handcuffed to a "hitching post" without a shirt for seven hours "while the sun burned his skin," during which time "he was given water only once or twice and was given no bathroom breaks" and a guard "taunted [him] about his thirst" by giving water to some dogs, bringing the water cooler near the prisoner, and then intentionally spilling all the water on the ground). Our case

is not the "rare" one "in which the constitutional right at issue is defined by a standard that is so 'obvious' that we must conclude . . . that qualified immunity is inapplicable, even without a case directly on point." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013), *quoting Hope*, 536 U.S. at 740–41. Accordingly, the district court's denial of immunity cannot be affirmed on this basis either.

## IV.

Deputy Gelhaus misjudged the threat that Andy posed, and Andy's death is the heartbreaking result of that miscalculation. In circumstances like these, it is imperative that we do justice. But justice does not invariably require punishing the officer. A reasonable mistake of law or fact is not enough to impose liability. *Pearson*, 555 U.S. at 231. The law affords relief only when an officer transgresses a boundary clearly established by precedent at the time he acts. If no such case exists, the officer cannot be held liable even if his conduct, the court believes in retrospect, may be unreasonable.

This is the situation that we face. The facts of the cases that the majority relies on to reach the opposite conclusion are materially different from the real facts before us. Those cases therefore could not have given Deputy Gelhaus notice that using deadly force against Andy would violate his constitutional right. Although all are sympathetic to Andy's family, as anyone should be, I am duty-bound to conclude that we must provide Deputy Gelhaus with the "breathing room to make reasonable but mistaken judgments about open legal questions" that qualified immunity affords him. *al-Kidd*, 563 U.S. at 743. For these reasons, I dissent.