**NOT FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**

JUL 15 2021

TERRANCE AMONS, TERRELL AMONS, and SANDRA TALBERT,

Plaintiffs-Appellees,

v.

DILLON TINDALL and JESUS ARELLANO,

Defendants-Appellants,

and

CITY OF PITTSBURG,

Defendant.

No. 20-16351

D.C. No. 4:19-cv-00301-KAW

MEMORANDUM*

Appeal from the United States District Court
for the Northern District of California
Kandis A. Westmore, Magistrate Judge, Presiding

Argued and Submitted May 10, 2021
San Francisco, California

Before: WALLACE and COLLINS, Circuit Judges, and RAKOFF,** District Judge.

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

** The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

On the evening of January 12, 2018, Pittsburg Police Department Officer Dillon Tindall fatally shot decedent Terry Amons. Mr. Amons's sons and mother sued Officer Tindall and the other officer on the scene, Jesus Arellano, as well as the City of Pittsburg, alleging that Officer Tindall and Officer Arellano (collectively, "the officers") used excessive force. The officers moved for summary judgment, including on grounds of qualified immunity, and the district court denied the motion. The officers now appeal, and we reverse in part, vacate in part, and remand for further proceedings.

I

This incident began when a caller reported a possible drug sale in a Nation's Hamburgers parking lot; Officers Tindall and Arellano were dispatched to the scene. Upon their separate arrival, they noticed a blue Chevrolet Cruze backed into a parking space with its headlights on. This roughly matched the caller's description of the car involved in the possible drug sale. Someone was sitting in the driver's seat. The subsequent events unfolded rapidly, but they were recorded on the officers' body-worn cameras. The footage forms part of the record on appeal.

The officers parked their cars and spoke briefly. Officer Arellano directed his flashlight at the windshield of the blue Chevrolet. Officer Arellano began walking toward the Chevrolet, approaching from the front of the vehicle. Officer Tindall followed a few feet behind. Officer Arellano again directed his flashlight toward the

Chevrolet as he neared the front of the vehicle and walked around the front passenger side. Mr. Amons was sitting in the driver's seat, looking at Officer Arellano.

Officer Arellano noticed a gun in plain view within the center console cupholder between the driver's seat and the passenger seat. Officer Arellano drew his service weapon and pointed it at Mr. Amons. Officer Tindall drew his weapon as well. Mr. Amons put his hands up. Officer Arellano radioed dispatch, "I got a gun." Officer Tindall circled around to the driver's side of the vehicle.

After arriving on the driver's side of the vehicle, a few feet from the driver's side door, Officer Tindall said, "If you reach for that fucking gun." Officer Arellano said, "Put your hands on the fucking steering wheel! Right now!"

Beginning immediately after Officer Arellano drew his weapon, Mr. Amons kept his hands in the air and continued to do so until Officer Arellano commanded him to put his hands on the steering wheel, a period of about nine seconds. Following Officer Arellano's command, Mr. Amons immediately put his hands on the steering wheel. Officer Arellano illuminated the inside of the vehicle again with his flashlight, and Mr. Amons lifted his hands very slightly off the steering wheel in a shrugging motion. Mr. Amons said something to Officer Arellano which was too faint to be audible on Officer Tindall's body-worn camera, which was the only one for which audio was activated at that moment.

Officer Arellano said, apparently in response to Mr. Amons, "OK. Leave your hands right there. My partner's going to take you out of the car, alright?" As Officer Arellano said this, Officer Tindall reached for the driver's side door handle and opened the door.

From when Officer Arellano first commanded Mr. Amons to place his hands on the steering wheel until Officer Tindall opened the door, a period of approximately six seconds, Mr. Amons kept his hands on or slightly above the steering wheel. As Officer Tindall opened the door, however, Mr. Amons slid his right hand down along the right side of the steering wheel and down toward his right hip.

Officers Tindall and Arellano then issued a series of loud, urgent commands over the course of five seconds. Officer Tindall yelled, "Do not reach for that fucking gun! Put your hands up! Put your fucking hands up! Put your fucking hands up!" Officer Arellano yelled something unintelligible ending with the word "gun!"

During this same five-second period, Mr. Amons initially kept his left hand up, but he did not put his right hand up. Rather, his right hand was above and slightly to the right of his right knee, a few inches from the gun, and then on the car's gear shift knob. He then moved his right hand across his lap from right to left and grabbed gloves that were on his lap. He lowered his left hand and passed the gloves into that

4

hand. Then, he moved his right hand back toward his right hip again, while saying, "But I'm not reaching for — !" As Mr. Amons reached back down toward his right hip, Officer Arellano stepped back slightly and began to say, "Hey — !" Officer Tindall fired six shots in rapid succession, hitting Mr. Amons several times in the side and back.

Mr. Amons screamed and said, "I'm not reaching for nothing." The officers commanded Mr. Amons to get out of the vehicle, which he did, lying face down. The officers radioed for medical assistance, handcuffed Mr. Amons, and emptied his pockets. They looked into the rear seat to confirm that no one else was in the car. An ambulance arrived about two minutes after the shooting. EMTs provided medical assistance, but Mr. Amons succumbed to his wounds and was pronounced dead at the hospital.

Mr. Amons's sons sued the officers for excessive use of force, in violation of the Fourth Amendment, and for related violations of state law (negligence, battery, and violation of California Civil Code § 52.1 (the "Bane Act")). Mr. Amons's sons and mother also brought a claim for loss of familial relationship, alleging that the officers' conduct violated the substantive due process protections of the Fourteenth Amendment. The district court denied the defendants' motion for summary judgment and held that the officers were not entitled to qualified immunity on any claim.

5

## II

Plaintiffs-Appellees argue that we lack jurisdiction over this interlocutory appeal. Ordinarily, courts of appeals may only review district courts' "final decisions." 28 U.S.C. § 1291. However, we may review prejudgment or collateral orders if review would "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (quotation marks and citation omitted). Because qualified immunity with respect to the federal claims is an immunity not only from liability but also from standing trial, "[w]e have jurisdiction to review a district court's order denying summary judgment on a qualified immunity defense under the collateral order doctrine. However, our jurisdiction is limited to purely legal issues." *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000) (quotation marks and citations omitted). When the district court denies qualified immunity and the only issues raised on appeal are factual, we lack jurisdiction. *E.g.*, *Velasquez v. Senko*, 813 F.2d 1509, 1511 (9th Cir. 1987) (deciding there is no jurisdiction to consider factual disputes regarding whether the defendant officers were present at the scene).

Here, however, the questions presented on appeal are legal, not factual. Officers Tindall and Arellano do not dispute that Officer Tindall fatally shot Mr.

Amons. Rather, the officers argue that, even viewing the evidence in the light most favorable to the plaintiffs and drawing reasonable inferences in favor of the plaintiffs, the officers are entitled to summary judgment and qualified immunity as a matter of law. We have jurisdiction to address these legal issues under *Mitchell v. Forsyth*, 472 U.S. 511 (1985), and its progeny. *See Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014) ("Petitioners do not claim that other officers were responsible for shooting Rickard; rather, they contend that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law. Thus, they raise legal issues[.]"). "Where there are disputed issues of material fact, our review is limited to whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012).

III

"We review summary judgment determinations *de novo*. We also review *de novo* a defendant officer's entitlement to qualified immunity." *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017) (citations omitted). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. We view the facts in the light most favorable to the nonmoving party and

7

draw reasonable inferences in favor of that party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). We must, however, reject as unreasonable proffered facts or inferences that are manifestly inconsistent with videotape evidence, the authenticity of which is not challenged. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

"Our de novo review of a grant of summary judgment based on qualified immunity involves two distinct steps." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014). A government official is entitled to qualified immunity unless (1) "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "We may address these two prongs in either order." *Sandoval*, 756 F.3d at 1160 (citing *Pearson*, 555 U.S. at 236). We address the former prong first.

A.

Plaintiffs-Appellees' federal claims arise under 42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who, under the color of state law,

abridges rights unambiguously created by the Constitution or laws of the United States." *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012) (quotation marks and citations omitted). There is no dispute that Officer Tindall—an armed, uniformed, on-duty police officer—was acting under color of state law when he shot and killed Mr. Amons. The sole dispute is whether Officer Tindall violated a right secured by the Constitution or laws of the United States.

Plaintiffs-Appellees first assert that Officer Tindall violated the decedent's rights under the Fourth Amendment, which prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). To prove a claim for excessive force under the Fourth Amendment, a plaintiff must demonstrate, on "the facts and circumstances of [the] particular case," that the officer used unreasonable force. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and we must consider "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. In assessing reasonableness, relevant factors include, without limitation, "the severity of the crime at issue, whether the suspect

9

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Whether the suspect poses an immediate threat is the "most important" factor. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (citation omitted).

Here, viewing the sequence of events as depicted in the videotapes, we conclude that no material facts are in genuine dispute and that a reasonable factfinder would necessarily find that the officers' use of force was objectively reasonable.

To be sure, the officers were responding to a report of a nonviolent crime, and when they first arrived, the officers had no reason to believe that Mr. Amons posed a threat. But then they saw a firearm in plain view and within arm's reach, suggesting the possibility that an imminent threat could arise. The officers responded reasonably by drawing their weapons and issuing commands:

> "If you reach for that fucking gun."
> "Put your hands on the fucking steering wheel! Right now!"
> "Okay. Leave your hands right there. My partner's going to take you out of the car right now, alright?"

Mr. Amons initially complied with the officers' commands. However, after Officer Tindall opened the driver's side door, Mr. Amons reached his right hand down toward his right hip, inches away from the gun. Whether firing at that time would have been unreasonable we need not decide, because the officers did not shoot. Instead, before using deadly force, they redoubled their commands:

> "Do not reach for that fucking gun!"

10

"Put your hands up!"
"Put your fucking hands up!"
"Right now!"
"Put your fucking hands up!"

The driver's side door was open, the passenger's side window was open, and these commands were loud, urgent, and reiterated over the course of five seconds. There is no reason to believe that Mr. Amons would not have heard or understood them. Yet Mr. Amons did not put his right hand up. Instead, he again moved it down toward his right hip in the direction of the gun. A fraction of a second later, Officer Tindall opened fire.

When Mr. Amons violated the officers' clear, repeated commands and again reached in the direction of the gun that was inches away, an objectively reasonable officer in Officer Tindall's position would have viewed Mr. Amons's gesture as a threat to his life and to the life of Officer Arellano. *Cf. Cruz v. City of Anaheim*, 765 F.3d 1076, 1078–79 (9th Cir. 2014) ("Usually when we're deciding whether to grant summary judgment for the police in deadly force cases we must wade through the factbound morass of 'reasonableness.' Not so here: *It would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in*

11

*his waistband, or even if he reaches there for some other reason*." (some internal quotation marks and citations omitted) (emphasis added)).[1]

Plaintiffs-Appellees' reliance on *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), is misplaced. In *Lopez*, two officers saw a teenager walking along the side of the road with what appeared to be an AK-47. They ordered him to drop the gun, but he did not. He began to turn in their direction and one officer immediately and fatally shot him. We started from the principle that "summary judgment should be granted sparingly in excessive force cases," especially where "the only witness other than the officers was killed during the encounter." *Id.* at 1006 (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)). We concluded that summary judgment was inappropriate because, to decide whether the decedent posed an immediate threat to the officers, a factfinder would need to "resolve a number of genuine factual disputes." *Id.*

Here, however, *Lopez*'s reasoning does not apply because we do not rely at all upon the officers' testimony; rather, we ascertain the reasonableness of the

---

[1] We do not read *Cruz* to suggest that officers may open fire whenever a suspect reaches for his waistband or hip. In *Cruz*, we found that the officers would have been justified in shooting if Mr. Cruz reached for his waistband because, among other reasons, they were aware of "Cruz's dangerous and erratic behavior" in prior interactions with police. 765 F.3d at 1078. The same cannot be said of Mr. Amons. On the other hand, in *Cruz* the officers only *suspected* that the decedent had a gun in his waistband; here, the officers *knew* that Mr. Amons had a gun within arm's reach and that he did, in fact, reach in that direction, despite repeated orders not to do so.

officers' conduct from a neutral and undisputed source—the body-worn camera footage. Because of that footage, there are no genuine disputes regarding any material facts.

The district court erred in holding to the contrary. The magistrate judge reasoned:

> Officer Arellano's body worn camera footage clearly shows that Decedent was wearing a seatbelt when he was approached by the officers. Officer Tindall's body worn camera footage does not clearly show where Decedent is reaching immediately prior to shots being fired. That said, given that Decedent appears to be following the officers' commands, and viewing the evidence in the light most favorable to Plaintiffs, the Court must infer that he was reaching to unbuckle his seatbelt, so that he could exit the vehicle as ordered. A jury could also find that Officer Tindall panicked when he shot Decedent.

ER 7 (citations omitted).

The district court's analysis contains two errors, one of fact and one of law. First, as a factual matter, the videotape plainly demonstrates that Mr. Amons did not follow the officers' commands. The district court was apparently persuaded that a factfinder might reasonably have accepted Plaintiffs-Appellees' argument that Mr. Amons was confronted with "contradictory commands" because Officer Arellano said, "Okay. Leave your hands right there. My partner's going to take you out of the car right now, alright?" But this statement contains only one command: "Leave your hands right there." By informing Mr. Amons that his partner was going to take

13

him out of the car, Officer Arellano did not command Mr. Amons to unbuckle his seatbelt.

Second, as a legal matter, the district court erred by considering Mr. Amons's subjective intent rather than viewing the evidence objectively from the perspective of an officer in Officer Tindall's position. With the benefit of hindsight, and with the ability to minutely parse the body-worn camera footage, we agree that Amons may have intended to unbuckle his seatbelt, not to reach for his weapon. However, Mr. Amons's subjective intent is legally irrelevant to the question presented here. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "[w]e cannot consider evidence of which the officers were unaware." *Hayes v. County of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013) (quotation marks and citations omitted). A reasonable factfinder would necessarily find that in the face of repeated commands to put his hands up, Mr. Amons failed to do so and instead reached in the direction of a gun that was mere inches from his hand. Thus, whatever Mr. Amons intended to do, Officer Tindall's decision to respond with deadly force was objectively reasonable. The district court erred by denying his motion for summary judgment.

B

Plaintiffs-Appellees' second federal claim, also under Section 1983, is for loss of familial relationship. The Fourteenth Amendment prohibits state deprivation of "life, liberty or property, without due process of law." U.S. Const. amend. XIV. Executive action can violate the Due Process Clause when it amounts to "an abuse of executive power . . . clearly unjustified by any legitimate objective of law enforcement," *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998), and such "substantive due process violations are actionable under § 1983," *id.* However, "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* at 847 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)). Because a reasonable jury would necessarily find that Officer Tindall's use of force was objectively reasonable, it would also find that Officer Tindall's actions were not conscience shocking in a constitutional sense. Therefore, Officer Tindall is also entitled to summary judgment on the Fourteenth Amendment claim.

C

Plaintiffs-Appellees argue that Officer Arellano is liable under § 1983 on two theories: first, as an "integral participant" in Officer Tindall's use of force; and second, because Officer Arellano, too, used force by brandishing a firearm. We

15

disagree. Because we hold that a reasonable factfinder would necessarily conclude that Officer Tindall's use of force was objectively reasonable under Fourth Amendment standards, we also hold that, regardless of whether Officer Arellano is properly characterized as an "integral participant," Plaintiffs-Appellees cannot recover against him under § 1983 for Officer Tindall's use of force. Furthermore, no factfinder could reasonably conclude that Officer Arellano's own use of force was objectively unreasonable under Fourth Amendment standards. He was responding to a reported drug transaction and witnessed a firearm in plain view, within arm's reach. A reasonable factfinder would necessarily conclude that drawing and pointing his service weapon at Mr. Amons, without firing, was an objectively reasonable response.[2]

D

Plaintiffs-Appellees also bring state-law claims for negligence, battery, and violation of the Bane Act. The district court denied summary judgment with respect to these claims on the ground that the applicable state and federal standards were largely the same and therefore required the same result. In view of our reversal of the denial of summary judgment on the federal claims, the district court's reason for denying summary judgment on the state-law claims necessarily fails. We cannot,

---

[2] At the very least, we are satisfied that the officers did not violate clearly established law in light of *Cruz*, 765 F.3d at 1078–79. Therefore, the second prong required to abrogate qualified immunity is not satisfied either. *Pearson*, 555 U.S. at 232.

16

however, accept the officers' request that we go further and order the district court to enter summary judgment in their favor on the state-law claims. Our federal-law ruling does not necessarily dictate the outcome on the state-law claims, because the district court was wrong in assuming that the applicable state-law standards are identical to the federal standards. *See Tabares v. City of Huntington Beach*, 988 F.3d 1119 (9th Cir. 2021) (holding that, because "California negligence law overall is broader than federal Fourth Amendment law in excessive force cases," the district court erred in "conflat[ing] Fourth Amendment excessive force standards with California negligence law" (citation and internal quotation marks omitted)); *see also Reese v. City of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) (noting that a Bane Act claim requires an inquiry into the officer's intent). Resolution of the state-law claims would thus require us to address additional questions beyond the federal qualified-immunity issues, and we lack jurisdiction to do so, in part because the officers do not argue that state qualified immunity applies. *See Billington v. Smith*, 292 F.3d 1177, 1191 (9th Cir. 2002), *overruled on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017); *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013) ("[The defendant] could have appealed the district court's decision to deny him immunity under California state law, rather than under the federal law doctrine of qualified immunity; he did not.").

Accordingly, we go no further than to vacate the district court's denial of summary judgment on the state-law claims and remand for further proceedings.

**REVERSED in part, VACATED in part, and REMANDED.**